UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

IN RE:

SNP BOAT SERVICES, S.A.                    Chapter 15

              Debtor.                    Case No. 10-18891-JKO

_____/

**RESPONSE IN OPPOSITION
TO MOTION FOR ENTRY OF ORDER ENTRUSTING M/Y SIXTY FIVE TO
FOREIGN REPRESENTATIVE FOR ADMINISTRATION IN
FRENCH BANKRUPTCY (*SAUVEGARDE*) PROCEEDING [D.E. #37]**

Hotel Le St. James ("St. James"), a creditor of SNP Boat Services, S.A. ("SNP"

or, the "Debtor"), submits this response to the *Motion for Entry of Order Entrusting M/Y

Sixty Five to Foreign Representative for Administration in French Bankruptcy

(Sauvegarde) Proceeding*, dated May 5, 2010 (the "Motion") (D.E. #37), filed by the

foreign representative of SNP Boat Service, S.A. ("SNP" or "Foreign Debtor"), Pierre-

Louis Ezavin (the "Foreign Representative"), opposing the relief requested therein for the

reasons set forth below.

**Preliminary Statement**

Chapter 15 of the United States Bankruptcy Code (11 U.S.C. § 101 et seq.)

provides this Court with great discretion to grant or deny relief requested by a foreign

representative and, if any relief is granted, to impose conditions to protect creditors.

Here, knowing that Canada would not recognize a *Sauvegarde* as a foreign proceeding,

the Foreign Representative and SNP have intentionally avoided the Canadian courts.

Instead, the Foreign Representative and SNP seek to collaterally attack the Canadian and

Florida state court judgments in this Court with the hope this Court will overlook their

tactics and grant them purely discretionary relief under Chapter 15 without any protections for St. James or other creditors.

Moreover, the Foreign Representative and SNP come to this Court having treated claimants within the *Sauvegarde* differently upon their whim, without notice, without an opportunity for creditors to challenge the disparate treatment, and without an opportunity to appeal. The Foreign Representative, SNP, and apparently the French courts, have also repeatedly refused to acknowledge the legitimacy of the Canadian judgment and have disputed St. James' claim despite SNP having previously acknowledged its validity in writing.

SNP and the Foreign Representative have come into this Court with unclean hands. This Court should not countenance these inequitable actions by granting them the requested discretionary relief. Rather than attempting a collateral attack before this Court, the Foreign Representative should be directed to the Florida State courts and the Canadian courts to directly challenge the legitimate judgments therein.

### Factual and Procedural Background of St. James' Claim

1.      St. James is a Canadian company with its principal place of business in Montreal, QC, Canada. SNP is a French yacht company with its registered office located in Cannes, France.

2.      On or about May 24, 2008, St. James delivered a vessel (the "St. James Vessel") to SNP. A third party, Magnolia Trust or its nominee, was to pay 9.1 million Euros for another vessel (the "SNP Vessel") and SNP was obligated to pay 2.5 million Euros to St. James for the St. James Vessel. SNP apparently intended to use the funds

2

received from the sale of the SNP Vessel to pay St. James for the sale of the St. James Vessel.

3.    Despite subsequent assertions to the contrary, SNP accepted the St. James Vessel and, as of June 1, 2008, had registered the St. James Vessel with its insurer.  *See* Exhibit A, containing translated emails acknowledging receipt and insurance of the St. James Vessel.  In fact, after receiving the invoice for the St. James Vessel,[1] SNP's agent stated "We have already accepted the boat so you need not be concerned.  You have already sent the invoice for the boat.  All that remains is the transfer of documents."

4.    While the two sale transactions were intended to be relatively simultaneous, the SNP Vessel was not ready for delivery at the same time as the delivery of the St. James Vessel.  Rather than pay St. James immediately for the St. James Vessel, SNP requested that its payment to St. James be made immediately upon SNP's receipt of the funds from the sale of the SNP Vessel.  St. James agreed to such terms even though it meant a delay in its own receipt of payment.

5.    Subsequently, on or about September 30, 2008, Fairford Enterprises Corporation, a wholly owned company of the Magnolia Trust paid SNP 9.1 million Euros in exchange for the SNP Vessel, with the agreement that 2.5 million Euros would be immediately returned to pay for the St. James Vessel.

6.    No funds were ever paid to St. James.  The St. James Vessel was never returned to St. James.  St. James believes SNP never had any intention of paying any funds and that St. James was intentionally defrauded.

---

[1]  Contrary to SNP and the Foreign Representative's assertions in their pleadings in this Court and the French Commercial Court, St. James' claim arises from its invoice and SNP's acceptance of the St. James Vessel in accordance with that invoice.  St. James' claim does not arise from a contract between SNP and the Magnolia Trust.  St. James was never a party to such contract, a fact explicitly found by the Canadian courts prior to SNP's *Sauvegarde* and while SNP was appearing through counsel in the Canadian litigation.

7.      Approximately five months after accepting the St. James Vessel and four months after acknowledging its obligations to pay St. James, SNP purportedly sent St. James a notice that it was refusing delivery of the St. James Vessel.

8.      On October 24, 2008, St. James sent a demand letter to SNP demanding payment on the invoice for the sale of the St. James Vessel.  Shortly thereafter, on October 27, 2008, SNP brought a claim in the French Commercial Court (the "FCC Proceeding").  St. James was not served with notice of the FCC Proceeding until December 15, 2008.  In the FCC Proceeding, SNP requested an order finding that SNP did not have to pay St. James' invoice.  Additionally, SNP requested the French court to order St. James to pay its fees associated with instituting the FCC Proceeding.  In pursuing this matter, SNP relied upon its own contract with the Magnolia Trust and the forum selection clause in that contract, a contract that St. James never signed and to which St. James was not even a party.  This marked SNP's first attempt to obtain jurisdiction outside the reach of Canadian courts, an attempt SNP would make another half dozen times.

9.      On November 6, 2008, just after commencement of the FCC Proceeding but prior to St. James receipt of service or knowledge of that French proceeding, St. James commenced a proceeding in the Superior Court of Quebec to collect payment from SNP on the invoice for the St. James Vessel that SNP had accepted (the "Canadian Proceeding").

10.     On April 7, 2009, during the pendency of both the Canadian Proceeding and FCC Proceeding, SNP filed for *Sauvegarde* in the French Commercial Court at Cannes, France.  Importantly, SNP never filed a notice of *Sauvegarde* with the Canadian

4

court, never informed the Canadian court of the *Sauvegarde*, and never sought recognition of the *Sauvegarde* under Canada's cross-border insolvency provisions.

11.    Before the Superior Court of Quebec, a trial court, and the appropriate Canadian court of appeals, SNP asserted and litigated that the Canadian courts lacked personal and subject matter jurisdiction.  The Canadian courts ruled against SNP and found that jurisdiction in Canada was proper (all such decisions were prior to the *Sauvegarde*).  See Canadian Judgments attached hereto as Exhibit B.  This was SNP's second attempt at avoiding the reach of Canada's courts.

12.    Prior to the entry of this Canadian judgment, both the Foreign Representative and SNP were served with notice that such a judgment would be entered if they did not obtain replacement counsel and defend the litigation.  Having lost their first and second attempts to avoid the Canadian courts on jurisdictional arguments,[2] the Foreign Representative again chose to avoid the Canadian courts.  Critically, they did not seek recognition of the *Sauvegarde* in Canada or ask the Canadian courts to stay the Canadian Proceeding based on the *Sauvegarde*.

13.    Following the jurisdictional rulings and after withdrawal of SNP's counsel, the Superior Court of Quebec entered a judgment on October 16, 2009, in favor of St. James in the full amount owed by SNP, $4,047,500 Canadian dollars, *i.e.* U.S. $3,864,035.

14.    Importantly, as set forth below and in the Declaration of Maurice Trudeau, due to important differences between the Canadian and United States versions of the Model Law on Cross-Border Insolvency (the "Model Law"), Canada would not recognize

---

[2]  The Canadian courts explicitly found that forum selection clauses in the contract between SNP and the Magnolia Trust were inapplicable, as St. James was not a party to that contract.

the *Sauvegarde* and the Canadian Proceeding would, under all circumstances, be permitted to advance. Rather than contest this process and directly challenge the legitimacy of the Canadian Proceeding in Canada, the Foreign Representative and SNP deliberately avoided the Canadian courts in favor of later collaterally challenging the Canadian judgment in two different courts in the United States.

15.    Having obtained a legitimate Canadian judgment, St. James sought to properly domesticate its judgment in Florida, where St. James understood SNP had assets. In doing so, St. James provided proper notice to SNP's United States Agent. SNP and the Foreign Representative had thirty days within which to challenge the domestication of the Canadian judgment in the Florida State Court. SNP and the Foreign Representative also could have come to this Court at that time to request recognition and imposition of a stay. SNP did neither.

16.    Having properly domesticated its judgment in Florida, St. James obtained appropriate Writs of Execution for vessels registered to SNP, *i.e.* the M/Y Sixty Five and the Foursome, among others. In response, neither the Foreign Representative nor SNP sought to challenge the Writ of Execution or to file a Chapter 15. Rather, they waited until after execution was successful and then filed pleadings to vacate both the writ of execution and the domestication of the Canadian judgment, marking the fourth time the Foreign Representative and/or SNP sought to avoid the effect of Canada's courts and jurisdiction.

17.    Only after the Florida State Court ordered the parties to mediation and refused to grant the Foreign Representative and SNP emergency relief did SNP seek recognition of the *Sauvegarde* in this Court.

6

18.     Upon recognition, the Foreign Representative and SNP had the ability to intervene under Section 1524 and directly challenge the judgments and orders of the Florida State Court.  However, just as they sought to avoid a direct challenge to the Canadian judgment in Canada, the Foreign Representative and SNP now seek to avoid a direct challenge to the Florida judgment or Writ of Execution in Florida State Court, instead asking this Court to collaterally review these orders and judgments.  This marks at least the fifth time they have sought to avoid a direct challenge in the court of proper jurisdiction.

19.     Within France, the Foreign Representative and SNP have disputed, and sought to avoid, the Canadian court's judgment in two additional proceedings, not including the still pending declaratory action.  First, they have contested St. James' claim despite the valid Canadian and Florida State Court judgments.  The French Commercial Court overseeing the *Sauvegarde* has yet to rule upon this challenge to St. James' claim or to acknowledge the validity of the Canadian judgment.

20.     Second (or the seventh time overall), within the injunction proceeding brought by the purported purchaser of the Foursome, Ste. LOV L43, Ltd. or S.A.S. Financiere LOV, neither the Foreign Representative or SNP acknowledged the existence of the then pending Florida State Court domestication of the Canadian judgment nor the Writ of Execution concerning the Foursome.  Most surprising is the fact that the French Commercial Court did not acknowledge the Canadian or Florida State Court judgments, despite receiving into evidence a copy of the Canadian judgment, an affidavit of American counsel, and the Order regarding seizure.

21.     While attempting to avoid St. James' legitimate, acknowledged, and judicially determined claim, the Foreign Representative and SNP have given preferential and favorable treatment to several creditors of equal or lesser priority with St. James.  For example, SNP's *Sauvegarde* plan specifically acknowledges that despite paying certain of its unsecured debt over 10 years (after five years, less than 25% of such claims will have been paid), other creditors of equal priority, whom SNP uses as suppliers, were paid on account of prepetition claims in excess of 100 million Euros.  *See* Declaration of Karine Remond.

22.     Moreover, despite SNP's protestations that the *Sauvegarde* plan treats creditors equally, SNP has given vastly preferential treatment to individual creditors of its choosing, including LOV L43.  LOV L43, like St. James, was a prospective yacht purchaser and seller that was left with an unsecured claim at the time the *Sauvegarde* was filed.  See Translated settlement Order between LOV L43 and SNP.  SNP, however, decided to provide LOV L43 with exceptionally favorable treatment on its unliquidated claim – outside of the *Sauvegarde* plan -- while simultaneously objecting to St. James' claim that had already been reduced to judgment. They of course also seek to deny judgment creditor St. James treatment similar to LOV L43 by asking this Court to deprive St. James of its execution liens against the M/Y Sixty Five and Foursome vessels.

23.     The LOV L43 settlement order also notes how other creditors that the Foreign Representative and SNP similarly desired to treat favorably were given full value for their claims ten years before other unsecured creditors through a full credit toward the transfer of a new vessel.  *See* Settlement Order attached hereto as Exhibit C. Interestingly, SNP was to market the vessel and still retained an interest in the vessel.

Should the vessel sell for an amount that generates funds greater than the creditor's setoff, those funds would be returned to SNP.  In essence, SNP removed an asset from its *Sauvegarde* estate in title only to favor a preferred creditor.  This action is a blatant fraudulent transfer.[3]

24.     More troubling, these preferential settlements were brought before the *Sauvegarde* court without (i) notice to other similarly situated creditors (including St. James), (ii) an opportunity for other creditors to object; and (iii) an opportunity for other creditors to appeal.  *See* Affidavit of Karine Remond.

25.     Given the Foreign Representative and SNP's repeated efforts to collaterally challenge the Canadian and Florida State Court judgments while avoiding the jurisdiction of those courts, as well as the unfair and preferential treatment of similarly situated creditors in SNP's *Sauvegarde*, the Court should exercise its discretion and refuse to turn over control and full authority of the M/Y Sixty Five or its proceeds to the Foreign Representative, SNP and the French Commercial Court.

26.     Instead, this Court should direct the Foreign Representative (i) pursuant to Section 1524, to intervene in the Florida State Court proceeding and challenge the orders and judgments of that Court directly, and (ii) to seek recognition of the *Sauvegarde* in Canada and request that a Canadian court rule on the legitimacy of the Canadian judgment.

---

[3]  Notably, the Settlement order articulates one reason for approval was "[t]o maintain a commercial relationship with an important client of SNP.  [T]he overseeing judge has on many occasions had the opportunity to encourage settlement agreements of this type . . . which SNP Boat Service has been authorized to enter into with it [sic] main clients."  Settlement Order at ¶ 7.

27.    St. James respectfully requests that this Court, in the interest of comity, not countenance the efforts to avoid Canada's right to rule upon the legitimacy and enforcement of its own judgment.

**Analysis**

28.    This Court should deny the relief sought by the Foreign Representative. First, the discretionary relief of entrusting U.S. assets to SNP and the Foreign Representative should not be granted because the record demonstrates that if allowed, the interests of St. James would not be sufficiently protected. Second, the Court should provide comity to Canada and its judgment by denying the requested relief absent recognition of the *Sauvegarde* proceeding in Canada. Third, the Court lacks subject matter jurisdiction, pursuant to the *Rooker-Feldman* doctrine, to collaterally attack the judgments and orders of a state court with proper jurisdiction, which the relief requested by SNP and the Foreign Representative would require.

I.    **The Court may not entrust the administration or distribution of any assets located in the United States to SNP and the Foreign Representative because doing so will not sufficiently protect the interests of St. James.**

29.    SNP and the Foreign Representative ask this Court to exercise its discretion, pursuant to Section 1521(a)(5), to entrust them with the M/Y Sixty Five vessel and its proceeds, and further, pursuant to Section 1522(b), to entrust them with the distribution of those assets in France.  However, they concede that this relief can only be granted if the interests of creditors in the United States are "sufficiently protected." The interests of St. James, which is plainly a creditor in the United States based on its Florida

State Court judgment, cannot be sufficiently protected and, as such, the requested relief must be denied. [4]

30.    The "sufficient protection" standard permeates Chapter 15 and the granting of any discretionary relief under Section 1521.  Not only is this standard established in Section 1521(b) as to the interest of creditors in the United States, but Section 1522(a) also broadly conditions any relief under Section 1521 on sufficiently protecting the interests of creditors and other interested parties wherever located.

31.    Sufficient protection requires satisfaction of at least three basic principles: "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law."  *In re Artimm, S.R.L.*, 335 B.R. 149, 160 (Bankr. C.D. Cal. 2005) (analyzing under § 304(c) of the pre-Chapter 15 Code, but noting that the analysis would be "essentially the same" under § 1521(b)).  These principles are set forth as well in Section 1507(b), which states that "in determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure" that these principles are met.

32.    The *Sauvegarde* proceeding, and in particular the manner in which SNP and the Foreign Representative have administered it, fails to satisfy any of the required elements of sufficient protection.

---

[4] Contrary to the Foreign Representative's assertion that St. James is not a "creditor[] in the United States" because it is a foreign entity, St. James possesses a valid judgment of a United States court and has executed on assets of SNP within the United States.  As such, St. James is a "creditor[] in the United States."

33.     ***Lack of Just Treatment***. In its *Sauvegarde* proceeding, SNP is doing anything but providing just treatment to all holders of claims. Instead, it prefers certain favored unsecured creditors over other unsecured creditors and, in particular, over St. James, which holds a judgment and execution lien on certain of SNP's assets. During the pendency of the *Sauvegarde,* SNP paid more than 100 million Euros to certain of its suppliers and trade debt.  Additionally, as detailed above, the settlement with LOV L43's demonstrates preferential treatment of an unsecured creditor with a claim of no better than equal priority as St. James.  Through this mechanism, LOV L43 will obtain full repayment on an expedited basis, outside of the *Sauvegarde* plan, yet LOV L43 also has an unsecured claim that arises from SNP's conduct in connection with the sale of a vessel.  This disparity in treatment among similarly situated creditors is unjust and SNP's *Sauvegarde* proceeding cannot satisfy this requirement of sufficiently protecting creditors.[5]

34.     ***No Protection Against Prejudice***. The *Sauvegarde* proceeding also prejudices St. James and other creditors.  First, instead of having the French court give comity to the Florida and Canadian courts by recognizing their judgments, SNP and the Foreign Representative are once again thumbing their noses at those courts. They continue to dispute St. James' claim, prejudicially treating the holder of a U.S. judgment, and are threatening to disallow in full the claim despite the underlying judgments.

---

[5] Under the Canadian Bankruptcy and Insolvency Act, an intentionally defrauded creditor has a right to seek that its claim not be discharged due to the debtor's conduct.  *See* Canadian Bankruptcy and Insolvency Act (R.S., 1985, c. B-3, s. 178; R.S., 1985, c. 3 (2nd Supp.), s. 28; 1992, c. 27, s. 64; 1997, c. 12, s. 105; 1998, c. 21, s. 103; 2000, c. 12, s. 18; 2001, c. 4, s. 32; 2004, c. 25, s. 83; 2005, c. 47, s. 107; 2007, c. 36, s. 54), § 178(d). A French *Sauvegarde* does not have a similar non-dischargeability provision.  Therefore, St. James would be unjustly prejudiced by its inability to assert that form of action in France and seek to accelerate its re-payment.

35.     In addition, SNP is abusing the *Sauvegarde* process by picking and choosing which U.S. assets it wants to include in the proceeding for its own benefit and which it wants to exclude from the reach of that proceeding. Specifically, in its inventory of assets filed in the *Sauvegarde*, SNP has included the Florida-based vessels it seeks to protect but has omitted reference to its interests in valuable U.S. subsidiaries, including SNP Boat Services, Inc., also based in Florida. *See* Declaration of Karine Remond & Exhibit D hereto, a copy of the Inventory of Assets filed in the *Sauvegarde*.   Such conduct further demonstrates the prejudice faced by creditors in SNP's *Sauvegarde* proceeding.

36.     Moreover, the French Commercial Courts, which oversee the *Sauvegarde* proceeding, exist to resolve French commercial disputes, but are also presided over by French commercial representatives, as opposed to attorneys and individuals with a traditional legal background.   This form of court system inherently lends itself to partiality towards large, local businesses, which are the community business partners of the decision-makers. They therefore lack independence and subject St. James to "prejudice and inconvenience in the processing of claims" in that court.   *See* Section 1507(a)(2).

37.     The Supreme Court of Canada in *Valente v. Queen* (1985) 2 R.C.S. 673 held that "independence" reflects or embodies the traditional constitutional value of judicial independence and connotes not only a state of mind but also a status of relationship to others that rests on objective conditions or guarantees. Judicial independence involves both individual and institutional relationships: the individual independence of a judge as reflected in such matters as security of tenure and the

institutional independence of the court as reflected in its institutional or administrative relationship. The French Commercial Court is constituted by part time judges who generally are still maintaining their commercial activities, who are elected by the business community only (L723-1 French Commercial code), and who are not paid (L722-16 French Commercial code). For these reasons, St. James doubts the independence of such court, especially when such a court may be contrary to the fundamental laws of Canada. For this reason only, any judgment of the French Commercial Court may not be recognized in Canada.

38.     Under these circumstances, St. James' unfair treatment can be seen by the lack of a summary decision despite the existence of correspondence confirming receipt of the St. James Vessel and the valid Canadian judgment regarding the same.

39.     ***Improper Distribution Scheme***. By bestowing dramatically preferential treatment on selected unsecured creditors, SNP and the Foreign Representative are using the *Sauvegarde* proceeding in a manner that turns the distribution scheme of the Bankruptcy Code and Section 1507(b)(4) on its head. As such, even if SNP had fully allowed St. James' claim in the *Sauvegarde* proceeding instead of disputing it, St. James would still be paid years later than other, preferred creditors of equal or junior priority to St. James.

40.     For these reasons, SNP's *Sauvegarde* proceeding fails to satisfy any of the "sufficiently protected" requirements of both Section 1521(b) and Section 1522(a), and the requested entrustment should be denied.

**II.**      **The requested relief should be denied on comity grounds.**

41.     Upon recognition of a foreign proceeding, this Court may grant additional relief or assistance to the foreign representative.  However, to do so, the Court must consider comity amongst international courts, as well as the other provisions of Chapter 15.  *See* 11 U.S.C. § 1507(b) & 1521.

42.     Comity, as defined by the seminal case on the concept, *Hilton v. Guyot*, and it's progeny, is:

> the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

159 U.S. 113, 164 (1895).

43.     International comity is based on three specific principles: "the proper respect for litigation in and the courts of a sovereign nation, fairness to the litigants, and judicial efficiency."  *Von Spee v. Von Spee*, 514 F. Supp. 2d 302, 318 (D. Conn. 2007); *see also Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th Cir. 1994). In light of those principles, post *Hilton* cases have determined that comity "will be granted to the decision or judgment of a foreign court" if two specific requirements are satisfied: (i) the foreign court must be a court of competent jurisdiction; and (ii) it must be shown that "the laws and public policy of the forum state and the rights of its residents will not be violated."  *Cunard Steamship Co. Ltd. v. Salen Reefer Services AB*, 773 F.2d 452, 457 (2d Cir. 1985).

44.     In explaining the basis for granting comity to a final foreign judgment, the *Cunard* court stated, "litigation should end after the parties have had an opportunity to present their cases fully and fairly to a court of competent jurisdiction."  *Id*. at 459.

45.    Most importantly, once the requirements of comity as it applies to foreign judgments have been satisfied, a foreign judgment can be pled as res judicata in a parallel proceeding[6] in the United States.  *China Trade and Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir. 1987) (citations omitted).

46.    The Canadian judgment arises from a "court of competent jurisdiction"[7] and SNP has not challenged due process in relation to the Canadian Proceeding that resulted in the judgment.  Canada entered a final judgment after ample opportunity for SNP to intervene and plead their case, and SNP and the Foreign Representative had a full opportunity to seek recognition of the *Sauvegarde*.  Further, a Florida State Court domesticated the Canadian judgment and SNP again failed to intervene and assert the *Sauvegarde*.  Litigation with respect to the Canadian judgment has been fully vetted and therefore, under the principles of international comity, all litigation surrounding the subject of the Canadian judgment – the M/Y Sixty Five vessel – should end.

47.    Judicial efficiency is also not served by overturning the Canadian judgment and thereby dismissing Canada's determinations as to jurisdiction.  That issue has already been determined by a foreign jurisdiction (Canada).  Similarly, St. James' right to execute upon the M/Y Sixty Five has been litigated and is still pending in the Florida State Court.  Eviscerating the effect of the Canadian judgment would also be

---

[6]    "Suits are parallel if substantially the same parties are litigating substantially the same issues simultaneously in two fora." *Schneider Nat'l Carriers, Inc. v. Carr*, 903 F.2d 1154, 1156 (7th Cir. 1990). Similarly, dismissal is warranted when two parallel proceedings are moving forward concurrently by and between very similar parties and issues, as "[t]he greater the similarity between the parties and issues in the foreign and domestic actions, the more this factor weighs in favor of dismissal." *Palm Bay International, Inc. v. Marchesi Di Barolo S.P.A.,* 659 F. Supp. 2d 407, 413 (E.D.N.Y. 2009) (citations omitted).

[7]  The existence of the Canadian judgment and implication of a third country's interests distinguishes this case from *In re Atlas Shipping A/S*, 404 B.R. 726 (Bankr. S.D.N.Y.  2009).  Contrary to the Foreign Representatives assertions, *Atlas* is also not comparable to the instant case because the foreign debtor/representative in *Atlas* did not choose to sit on its rights to raise the *Sauvegarde* in a prior proceeding.  Moreover, the attachments in *Atlas* did not arise from final judgments of two competent jurisdictions.

fundamentally unfair to St. James as re-litigating the remaining issues upon which the Canadian judgment was made, including re-litigating the issues within France as SNP seeks, would cause St. James to expend additional time and money, all the while delaying any potential recovery.

48.    Had SNP and the Foreign Representative asked the Canadian courts to recognize the *Sauvegarde* proceeding and preclude entry of the Canadian judgment, the petition would have been denied. Although France has refused to adopt the Model Law, Canada has done so.  Canada's version of the Model Law, however, is not identical to Chapter 15. The differences, as applied to a *Sauvegarde* proceeding in particular, are material.

49.    Specifically, to qualify as a "foreign proceeding" under Canada's cross-border insolvency law, the proceeding must involve "creditor's collective interests," *i.e.* be for the benefit of creditors, and cannot simply be a proceeding invoked to favor the debtor, as the *Sauvegarde* proceeding does.  Further, Canada's law requires that the creditor's proceeding actually involve "bankruptcy or insolvency" law, which the *Sauvegarde* proceeding does not.  *See* Canadian Bankruptcy and Insolvency Act (1997, c. 12, s. 118; 2004, c. 25, s. 102; 2005, c. 47, s. 122.), § 268; *see* also *Holt Cargo Systems Inc.* v *ABC Containerline N.V. (Trustees of)* 2001 SCC 90, 3 S.C.R. 907 ¶ 60 ("[The Court has] already rejected the Trustees' notion that once a foreign bankruptcy court is activated it necessarily occupies the field in relation to matters pertaining to the bankrupt in this country.  I have also rejected the idea that "international coordination" necessitates the rubber stamping of orders made by the foreign bankruptcy court.").

50. Instead, unlike a true bankruptcy proceeding, the French Commercial Code *Sauvegarde* proceeding requires that the debtor be solvent and not have defaulted on payments to creditors. Canada, therefore, would not grant recognition to the *Sauvegarde* proceeding as a "foreign proceeding" under Canadian law.

51. The *Sauvegarde* proceeding is an instrument for the benefit of the debtor, not creditors. It is not equivalent to a French bankruptcy or insolvency proceeding, and it is only available to a debtor that is solvent, not insolvent. *See* French Commercial Code § L620-1. In particular, to file a *Sauvegarde*, the debtor must be paying its debts as they become due. In addition to paying its debts as they became due, SNP was also balance sheet solvent when it instituted its *Sauvegarde* proceeding. *See* Declaration of Karine Remond.

52. For these reasons, Canada would not recognize the *Sauvegarde* proceeding as a foreign proceeding, the Canadian Proceeding would not be stayed, the Canadian judgment would be given full force and effect, and St. James would be allowed to execute upon it. *See* Declaration of Maurice Trudeau.

53. If this Court grants the relief requested by the Foreign Representative, it would be choosing which of two foreign jurisdictions to favor. This Court should avoid that dilemma by balancing the comity provided to France with comity for Canada.

54. By recognizing the *Sauvegarde* proceeding as a foreign main proceeding, the Court has already given comity to France. The Court should now give proper comity to Canada, whose courts issued a judgment that is being ignored by SNP, the Foreign Representative, and the French Commercial Court. It can provide Canada that comity by denying the discretionary relief sought in this case contrary to the Canadian judgment.

55.     Under Chapter 15's version of the Model Law, with its broad definition of "foreign proceeding," this Court may have been required to recognize the *Sauvegarde* proceeding.    Chapter 15, however, does not require the Court to grant any of the discretionary relief requested, particularly given the conduct in this case.  Here, SNP and the Foreign Representative waited a full year after the *Sauvegarde* commenced to ever raise its existence in court, instead dodging Canada's binding jurisdiction while the Canadian Proceeding moved to judgment. Then, they forum shopped and brought a recognition petition in the United States and not in Canada.  Given these facts, if this Court were to entrust the M/Y Sixty Five to SNP and the Foreign Representative, SNP's plan to make an end-run around Canada's judgment and its sovereign jurisdiction would be complete.  SNP should not be permitted to remove assets from this country, in defiance of the Canadian judgment, without first obtaining a recognition order from the Canadian courts.

**III.    The *Rooker-Feldman* doctrine bars the attempted collateral attacks on the judgments.**

56.     The *Rooker-Feldman* doctrine "provides that federal courts, other than the Supreme Court, have no authority to review the final judgments of state courts."  *King v. Epstein*, 2006 WL 328157 at *3 (11th Cir. Feb. 14, 2006) (citing *Goodman ex rel. Goodman v. Sipos,* 259 F.3d 1327, 1332 (11th Cir. 2001)).   Moreover, under the *Rooker-Feldman* doctrine, state judgments are valid and preclude federal review if a party participated in the state proceeding and had an opportunity to be heard.  *McCarty v. Grguric*, 2007 WL 2900329 at *6 (M.D. Fla. October 2, 2007).  In the instant case, SNP was aware of, participated in, and had an opportunity to voice any of its objections in the

state proceedings.  Notably, in the state proceedings SNP did not raise the issue of its foreign proceeding prior to judgment.

57.     Moreover, if SNP believes the state judgment or orders are incorrect or invalid, for any reason, an appropriate mechanism for appeal exists.  *King,* 2006 WL 328157 at **3 (finding that where the appropriate procedural remedy was to appeal in state court, a federal court lacks subject-matter jurisdiction even if an issue of federal question is implicated); *see also Goodman,* 259 F.3d at 1332 (11th Cir. 2001).

58.     Florida law affords recognized foreign out-of-country judgments enforcement "in the same manner as the judgment of a court of this state."  Fl. Stat. § 55.604(5).  "The effect of…granting recognition of a foreign judgment is that the foreign judgment is thereupon immediately enforceable as though it were a final judgment of a Florida Court."  *Chabert v. Bacquié,* 694 So. 2d 805, 808 (Fla. Dist. Ct. App. 1997) (citing Fla. Stat. §55.604).  Such judgment "becomes identical in effect with a judgment entered by a Florida court."  *Id*.

59.     In *King*, the Eleventh Circuit has also applied the *Rooker-Feldman* doctrine to issues that could or should have been litigated in connection with a writ of execution, similar to the writ of execution obtained by St. James.  *King*, 2006 WL 328157 at **3 ("All of the claims that the Kings could raise . . . flow directly from the Florida county court **and writ** . . . or should have been raised there. . . Thus, under the *Rooker-Feldman* doctrine, the district court had no subject matter jurisdiction to hear any of their claims.") (emphasis added).

60.     The pendency of the *Sauvegarde* does not alter this analysis, even if the Foreign Representative is correct that the Canadian Proceeding violated an applicable

20

French stay (a contention St. James disputes).  *See Zitani v. Reed*, 922 So.2d 403, 404 (Fla. Dist. Ct. App. 2008) (Court refused to vacate domestication of California judgment on grounds that the California judgment violated a discharge injunction.  "[T]he issues regarding the validity of the judgment or the dischargeability of all or a portion of the judgment are left to the court that entered the judgment or the bankruptcy court that issued the injunction.").

61.     The *Zitani* court ultimately upheld the legitimacy of the California judgment to "remain a recorded judgment in Florida *with all available means of collection*." *Id.* (emphasis added).

62.     Accordingly, any requested relief from the recognized Canadian judgment should be reviewed by an appropriate Canadian Court and any review of the Florida judgment should be reviewed by an appropriate Florida state court, not this Bankruptcy Court.  While this Court has recognized the Foreign Representative, it may not permit a collateral attack of the Florida judgment. Rather, this Court should direct the Foreign Representative to intervene in the Florida State Court proceedings to challenge the judgments and orders of that Court.

-- THIS SPACE INTENTIONALLY LEFT BLANK --

WHEREFORE, Hotel Le St. James respectfully requests that this Court deny the Motion, deny any additional assistance or relief to the Foreign Representative, and grant such further relief as the Court deems just and proper.

Respectfully submitted this 4[h] day of June, 2010.

> Messana Stern, P.A.
> Counsel for Hotel Le St. James
> 401 East Las Olas Boulevard, Suite 1400
> Fort Lauderdale, Florida 33301
> Telephone:  (954) 712-7400
> Facsimile:   (954) 712-7401
>
> /s/ Scott A. Underwood
> Scott A. Underwood
> Florida Bar No. 0730041
>
> Cooley LLP
> Co-counsel for Hotel Le St. James
> 101 California Street, Fifth Floor
> San Francisco, California 94111
> Telephone:     (415) 693-2000
> Facsimile:     (415) 693-2222
>
> Robert L. Eisenbach III (*pro hac vice*
> application pending)

## **EXHIBIT A**

*Translated emails acknowledging receipt and insurance of the St. James Vessel*

*((Translated from French*
*10-TC-0274*

**Jacques Plante**

ACCEPTANCE

From:        Eric L.Lepeingle [eric@lepeingle.com]
Sent:        Monday, June 30, 2008 3 :53 PM
To:          Jacques Plante
Subject:     Re: SALE OF ST-JAMES

Jacques,
We have already accepted the boat so you need not be concerned.
You have already sent the invoice for the boat. All that remains is
the transfer of documents.
See you later.

Sent via BlackBerry by AT&T

Eric L.Lepeingle

1651 Collins Ave.
Miami Beach, FL 33139
Cell: +1 954-806-5294
GMT +1
local number: +33 615 075 734



I certify that the above translation is in all respects a true and correct translation of
☑ the original document
☐ a copy of the original document
written in the ......... French .........
language.
Association's Reg. No.: *10-TC- 0274*

Translator: ...............................
*for Bernard Blanchard*

Solemnly declared and signed before me in the City of Montreal, Province of Quebec, on this ............ day of ......... APR 1 8 2009

*Julianne Feray*

COMMISSAIRE À L'ASSERMENTATION
Julianne Herczegh 161 972
COMMISSIONER OF OATHS
CIE. KELENY CO.
440 EST, RUE ST-ANTOINE
MONTRÉAL H2Y 1A5 CANADA
TÉL. (514) 845-3111 FAX: (514) 845-3006
For the district judiciaire de Montréal.
For the judicial district of Montreal.

**ASSOCIATION DES TRADUCTEURS ET INTERPRÈTES JUDICIAIRES**
**ASSOCIATION OF LEGAL COURT TRANSLATORS AND INTERPRETERS**

440 est, rue Saint-Antoine, Montréal, QC, Canada  H2Y 1A5
Tél.: (514) 845-3111          Fax: (514) 845-3006

*((Translated from French*
*10-TC-0274*

---

**Jacques Plante**

---

From:       Corinne MATHE [c.mathe@somecassur.fr]
Sent:       June 2, 2008 09:10
To:         plantejacques@maybachcorp.com
Subject:    Re: Insurance Le St-James mangusta 80

Dear Mr. Plante,

The boat is insured for SNP BOAT SERVICE since June 1st 2008

Yours truly,

Corinne Mathé

----- Original Message -----
From: "Jacques Plante"
<plantejacques@plantejacques@maybachcorp.com>
To: <c.mathe@somecassur.fr>; ""Jacques Plante"
<plantejacques@plantejacques@maybachcorp.com>"
Sent: Sunday, June 01, 2008 8:59 AM
Subject: Insurance Le St-James mangusta 80


Good day

>I have arrived from Cannes.
>
>
>How have you arranged the boat insurance?

>Did you transfer it to the Rodriguez fleet as agreed with them or is
it still on the extended policy?
>
>Jacques Plante
>Jacques Plante
>Maybach Corporation
>


_____Information NOD32 3152
(20080602)_____
This message was verified by NOD32 Antivirus System.
http://www.nod32.com

**<u>EXHIBIT B</u>**

*Canadian Judgments*

*((Translated from French*
*10-TA-0255*

*1/1*

C A N A D A
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL
No.: 500-17-046398-080

**S U P E R I O R   C O U R T**
(Civil Division)

HÔTEL LE ST-JAMES INC.

Plaintiff

vs.

SNP BOAT SERVICES SA

Defendant

and

THE MAGNOLIA TRUST

Mis-en-Cause

---

### NOTICE BY THE DEFENDANT OF AN EXCEPTION
### TO DISMISS THE ACTION ON THE BASIS OF LIS PENDENS
### (Sections 159 and 165(1) C.C.P.)

TO:

Me Maunce Trudeau
Lawyer
85 St. Paul Street West
Suite 510
Montreal, , Quebec H2Y 3V4
Attorney for Plaintiff

Me Paul Biron
Lawyer
150 Marchand Street
Suite 202
Drummondville, Quebec J2C 4N1
Attorney for the Mis-en-Cause

TAKE NOTICE that at the time of the presentation of the Originating Motion on Tuesday,
December 23, 2008, the Defendant will invoke *lis pendens*.

In fact, another petition having the same cause and the same object, namely the contract Exhibit P-5, is pending between the Parties before the Tribunal de Commerce, Cannes, France. A copy of the said petition with proof of service dated October 27, 2008 is annexed hereto.

FOR THESE REASONS, THE DEFENDANT WILL PRAY THAT THIS COURT

**DISMISS** the Originating Motion.
**SUBSIDIARILY, SUSPEND** the Originating Motion;
**THE WHOLE** with costs.

DO GOVERN YOURSELVES ACCORDINGLY.

MONTREAL , December 18, 2008
(s) DE MAN, PILOTTE
Attorneys for the Defendant
SNP Boat Service SA

ASSOCIATION DES TRADUCTEURS ET INTERPRÈTES JUDICIAIRES
ASSOCIATION OF LEGAL COURT TRANSLATORS AND INTERPRETERS

440 est. Saint-Antoine, Montréal, Qc, Canada  H2Y 1A5
TEL : (514) 845-9111          FAX : (514) 845-5006

*(Translated from French*
10-TA-0257                                                                1/2

# COURT OF APPEAL

CANADA
PROVINCE OF QUEBEC
COURT OFFICE OF MONTRÉAL

No.: 500-09-019346-097
(500-17-046398-080)

| MINUTES OF HEARING |
|---|

| DATE: January 30, 2009 |
|---|

| THE HONOURABLE JACQUES CHAMBERLAND, J.C.A. |
|---|

| PETITIONER | LAWYER |
|---|---|
| SNP BOAT SERVICE SA | Me Malvina Apostolatos<br>DE MAN, PILOTTE |

| RESPONDENT | LAWYER |
|---|---|
| HÔTEL LE ST-JAMES INC. | Me Maurice Trudeau<br>RCI ENVIRONNEMENT INC. AND LES<br>ENTREPRISES SOC. |
| THE MAGNOLIA TRUST | Me Paul Biron<br>PAUL BIRON LAWYER |

| MOTION FOR LEAVE TO APPEAL AN INTERLOCUTORY JUDGMENT OF THE SUPERIOR COURT RENDERED ON DECEMBER 23, 2008 BY THE HONOURABLE JEAN-YVES LALONDE IN THE DISTRICT OF MONTREAL. |
|---|

| Clerk: Christelle Malenfant | Room: Rc-18 |
|---|---|

*((Translated from French*
*10-TA-0256*

1/3

C A N A D A
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL
No.: 500-17-046398-080

S U P E R I O R   C O U R T
(Civil Division)

HÔTEL LE ST-JAMES INC.

Plaintiff

vs.

SNP BOAT SERVICES SA

Defendant

and

THE MAGNOLIA TRUST

Mis-en Cause

---

**NOTICE BY THE DEFENDANT OF A DECLINATORY EXCEPTION**
**(Sections 159 and 163 C.C.P.)**

TO:

Me Maurice Trudeau
Lawyer
85 St. Paul Street West
Suite 510
Montreal, Quebec H2Y 3V4
Attorney for Plaintiff

Me Paul Biron.
Lawyer
150 Marchand Street,
Suite 202
Drummondville, Quebec J2C 4N1
Attorney for the Mis-en-cause

TAKE NOTICE that at the time of the presentation of the Originating Motion on Tuesday, December 23, 2008, the Defendant will invoke the absence of jurisdiction of the legislative authority of Quebec courts in this matter.

Case 10-18891-JKO    Doc 54    Filed 06/04/10    Page 30 of 90

- 2 -

In fact, the Defendant is not domiciled in the judicial district where the present proceedings have been instituted, since its head office and principal place of business are situated on Croisette Boulevard, Port Pierre Canto 06400, Cannes, France.

Furthermore, the contract upon which the present Motion is based, namely Exhibit P-5, establishes the exclusive jurisdiction of the Tribunal de Commerce de Cannes to deal with any dispute between the Parties. Section 13 of the said contract states as follows:

### "13. DISPUTES – APPLICABLE LAW - JURISDICTION

The parties undertake to settle their disputes amicably and in good faith.

Failing an amicable agreement, every technical dispute shall exclusively be referred to the final decision of Bureau VERITAS, or to the expert appointed by BUREAU VERITAS, at the request of the most diligent party.

Any other dispute related to the interpretation or to the execution of this agreement shall exclusively be referred to the jurisdiction of the Tribunal de Commerce de Cannes, who will
judge by application of French law."

**FOR THESE REASONS, THE DEFENDANT WILL PRAY THAT THIS COURT**

**DISMISS** the Originating Motion;
**SUBSIDIARILY, SUSPEND** the Originating Motion;
**THE WHOLE** with costs.

**DO GOVERN YOURSELVES ACCORDINGLY**

MONTREAL, December 18, 2008

(s)
DE MAN, PILOTTE
Attorneys for the Defendant
SNP Boat Service SA

ASSOCIATION DES TRADUCTEURS ET INTERPRÈTES JUDICIAIRES

440 est. Saint-Antoine, Montréal, Qc, Canada  H2Y 1A5

*((Translated from French*
*10-TA-0257*

2/2

(500-09-019346-097)

| HEARING |
|---|

| 10:06: Beginning of the hearing. Identification of the attorneys. |
|---|
| 10:06: Argument by Me Apostolatos. |
| 10:15: Argument by Me Trudeau. |
| 10:41: Argument by Me Biron. |
| 10:47: Response by Me Apostolatos. |
| 11:01: End of hearing. See judgment on page 3. |
| |

Christelle Malenfant

Clerk of the Hearing

| JUDGMENT |
|---|

[1] The motion does not meet the test of section 511 C.C.P. concerning an interlocutory judgment ("the pursuit of justice requires that lease be granted")

[2] Taking into account the information contained in the file at this stage of the proceedings, and notably in the absence of any proof that would contradict the allegations of the Originating Motion and the information contained in the contract of May 16, 2008 (Exhibit P-5 alleged in paragraph 6 of the Originating Motion), the Petitioner does not establish, in my opinion, in what aspect the decision of the judge of first instance could be erroneous.

[3] I would add to these reasons the discretionary element related to the exception of *lis pendens* provided for in section 3137 C.C.Q. In substance, the appeal undertaken by the Petitioner appears to me to be doomed to failure and it would be contrary to the "pursuit of justice" to uphold the requested leave.

[4] **FOR THESE REASONS:**

[5] The motion is **DISMISSED** with costs.

(S)

JACQUES CHAMBERLAND, J.C.A.

*(Translated from French*
*10-TA-0256*

3/3

No.: 500-17-046398-080
S U P E R I O R   C O U R T
(Civil Division)

---

HÔTEL LE ST-JAMES INC.

Plaintiff

vs.

SNP BOAT SERVICES SA

Defendant

and

THE MAGNOLIA TRUST

Mis-en-cause

BP 2112

---

NOTICE OF THE DEFENDANT OF A
DECLINATORY EXCEPTION
(Sections 159 et 163 C.C.P.)

---

ORIGINAL

---

File No.: 5842-4

**Marc de Man/Malvina Apostolatos.**
DE MAN, PILOTTE
360 St. Jacques Street, Suite 1700
Montreal, Quebec H2Y IP5
(514) 985-2262
Fax: (514) 844-0S71

ASSOCIATION DES TRADUCTEURS ET INTERPRÈTES JUDICIAIRES
ASSOCIATION OF LEGAL COURT TRANSLATORS AND INTERPRETERS

440 est. Saint-Antoine, Montréal, Qc, Canada  H2Y 1A5

((Translated from French
10-TA-0258*

1/2

# COURT OF APPEAL

CANADA
PROVINCE OF QUEBEC
COURT OFFICE OF MONTREAL

No.: 500-09-019345-099
(500-17-046398-080)

| MINUTES OF HEARING |
| --- |

| DATE: January 30, 2009 |
| --- |

| THE HONOURABLE JACQUES CHAMBERLAND, J.C.A. |
| --- |

| PETITIONER | LAWYER |
| --- | --- |
| SNP BOAT SERVICE SA | Me Malvina Apostolatos<br>DE MAN, PILOTTE |

| RESPONDENT | LAWYER |
| --- | --- |
| HÔTEL LE ST-JAMES INC. | Me Maurice Trudeau<br>RCI ENVIRONNEMENT INC. AND LES<br>ENTREPRISES SOC. |
| THE MAGNOLIA TRUST | Me Paul Biron<br>PAUL BIRON LAWYER |

| MOTION FOR LEAVE TO APPEAL AN INTERLOCUTORY JUDGMENT OF THE SUPERIOR COURT RENDERED ON DECEMBER 23, 2008 BY THE HONOURABLE JEAN-YVES LALONDE IN THE DISTRICT OF MONTREAL |
| --- |

| Clerk: Christelle Malenfant | Room: Rc-18 |
| --- | --- |

((Translated from French
10-TA-0257

2/2

(500-09-019346-097)

| HEARING |
|---|

| 10:06: Beginning of the hearing. Identification of the attorneys. |
|---|
| 10:06: Argument by Me Apostolatos. |
| 10:15: Argument by Me Trudeau.. |
| 10:41: Argument by Me Biron. |
| 10:47: Response by Me Apostolatos. |
| 11:01: End of hearing.  See judgment on page 3. |
| |

Christelle Malenfant

Clerk of the Hearing

| JUDGMENT |
|---|

[1] The motion does not meet the test of section 511 C.C.P. concerning an interlocutory judgment ("the pursuit of justice requires that lease be granted")

[2] Taking into account the information contained in the file at this stage of the proceedings, and notably in the absence of any proof that would contradict the allegations of the Originating Motion and the information contained in the contract of May 16, 2008 (Exhibit P-5 alleged in paragraph 6 of the Originating Motion), the Petitioner does not establish, in my opinion, in what aspect the decision of the judge of first instance could be erroneous.

[3] I would add to these reasons the discretionary element related to the exception of *lis pendens* provided for in section 3137 C.C.Q. In substance, the appeal undertaken by the Petitioner appears to me to be doomed to failure and it would be contrary to the "pursuit of justice" to uphold the requested leave.

[4] **FOR THESE REASONS:**

[5] The motion is **DISMISSED** with costs.

(S)

JACQUES CHAMBERLAND, J.C.A.

*((Translated from French*
*10-TA-0259*

# SUPERIOR COURT

CANADA
PROVINCE OF QUÉBEC
DISTRICT OF MONTREAL

No.:        500-17-046398-080

DATE: DECEMBER 23, 2008

---

PRESIDING: THE HONOURABLE JEAN-YVES LALONDE, J.S.C.

---

HÔTEL LE ST-JAMES INC.
    Plaintiff
vs.
SNP BOAT SERVICE SA
    Defendant.
and
THE MAGNOLIA TRUST
    Mis-en-cause

---

### TRANSCRIPTION OF THE REVISED REASONS
### RENDERED AT THE CLOSE OF THE HEARING
### ON DECEMBER 23, 2008[1]

---

[1]     **CONSIDERING** the representations made by the attorneys.

[2]     **CONSIDERING** that the proceedings instituted at Cannes were not brought against The Magnolia Trust (hereinafter "Magnolia Trust").

---

1.  Request for the transcription of the reasons for judgment received December 23, 2008.
    Transmitted to the Parties on December 29, 2008.

JL3280

((Translated from French
10-TA-0259

2/2

500-17-046398-080

[3]    **CONSIDERING** that there is not complete identity of the Parties in the judicial proceedings pending in France and in Quebec.

[4]    **CONSIDERING** that on the one hand Hôtel Le St-James Inc.,(hereinafter "Le St-James") requests that the Court order the execution of a payment based on Exhibit P-9 (invoice).

[5]    **CONSIDERING** that the action instituted by SNP Boat Service SA (hereinafter   "SNP") at Cannes is directed solely against Le St-James, who is not a party to the contract P-5.

[6]    **CONSIDERING** that SNP cannot request the annulment of the contract (P-5) without impleading its co-contracting party Magnolia Trust, which it did not do in the litigation at Cannes.

[7]    **CONSIDERING** that there is no identity of object between both recourses pending at Cannes and at Montreal.

**FOR THESE REASONS:**

[8]    The declinatory exception based on *lis pendens* is **DISMISSED**;

[9]    **WITH COSTS**;

[10]    In default of filing an appeal against both judgments;

[11]    **ORDERS** the Parties and the attorneys to file into the Court record a timetable for the scheduling of the proceedings in this case at the latest on January 16, 2009.

(S)

JEAN-YVES LALONDE, J.S.C.

500-17-046398-080

MAURICE TRUDEAU
Attorney for Plaintiff

Me Malvina Apostolatos
DE MAN PILOTTE
Attorneys for the Defendant

ME PAUL BIRON
Attorney for the Mis-en-cause

Date of hearing: December 23, 2008

((Translated from French
10-TA-0260

1/2

# SUPERIOR COURT

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL

No.:        500-17-046398-080

DATE: DECEMBER 23, 2008

---

PRESIDING: THE HONOURABLE JEAN-YVES LALONDE, J.S.C

---

HÔTEL LE ST-JAMES INC.
        Plaintiff
VS.
SNP BOAT SERVICE SA
        Defendant
and
THE MAGNOLIA TRUST
        Mis-en-cause

---

### TRANSCRIPTION OF THE REVISED REASONS RENDERED AT THE CLOSE OF THE HEARING ON DECEMBER 23, 2008[1]

---

[1]    The Court is requested to adjudicate upon a declinatory exception attacking the competency of the Superior Court of Quebec on the basis of a contractual election of forum clause contained in the contract (P-5) binding The Magnolia Trust (hereinafter "Magnolia") and SNP Boat Service (hereinafter "SNP").

---

1. Request for the transcription of the reasons for judgment received December 23, 2008.
    Transmitted to the Parties on December 29, 2008.

JL3280

500-17-046398-080

[2]     SNP did not establish to the satisfaction of the Court that the Plaintiff in this case, Hôtel Le St-James Inc. (hereinafter "Le St-James"), was itself bound by the clause determining jurisdiction in the contract P-5. Here, Magnolia Trust is acting as a promising vendor, not owner of the boat at the time of the agreement. Section 1396 C.C.Q. establishes specifically that the promise in itself is not equivalent to the proposed agreement.

[3]     In the absence of provisions in the agreement determining jurisdiction opposable to Le St-James, the Court is of the opinion that it is primarily section 3148 (3) C.C.Q. that must apply to the facts of the present case. For Le St-James, the obligations arising from the sale comprised in the invoice P-9 should be executed here in Quebec, hence the jurisdiction of the Quebec Superior Court in this matter.

**FOR THESE REASONS:**

[4]     The declinatory exception regarding the absence of jurisdiction is **DISMISSED.**

(S)
_____
JEAN-YVES LALONDE, J.S.C.

MAURICE TRUDEAU
Attorney for Plaintiff

Me Malvina Apostolatos
DE MAN PILOTTE
Attorneys for the Defendant

ME PAUL BIRON
Attorney for the Mis-en-cause

Date of hearing: December 23, 2008



I certify that the above translation is in all respects a true and correct translation of
☑ the original document
☐ a copy of the original document
written in the FRENCH language.
Association's Reg. No.: 10-TA-255-260
Translator: [signature] P/ B. BLANCHARD

Solemnly declared and signed before me in the City of Montreal, Province of Quebec, on this 26th day of MARCH 2010

Julianna Herczegh [signature]
COMMISSAIRE À L'ASSERMENTATION
Julianna Herczegh 161/972
COMMISSIONER OF OATHS
CIE. KELENY CO.
440 EST. RUE ST-ANTOINE
MONTREAL H2Y 1A5 CANADA
TEL.: (514) 845-3111 FAX: (514) 845-3006
Pour le district judiciaire de Montréal.
For the judicial district of Montreal.

**<u>EXHIBIT C</u>**

*Settlement Order*

To the judge overseeing
the safeguard proceedings
<u>covering SNP Boat Service</u>

N° PCL: 2009J00084
Debtor:
SNP Boat Service
Safeguard Judgement:
7 April 2009
Overseeing judges:
Pierre Cousin
Denis Garrone
Court appointed Trustees:
Pierre Louis Ezavin
Eric Baulan
Court representative
Didier Cardon

Matter:
SNP Boat Service v Financiere LOV

| Application for authorisation to settle a dispute |
| --- |

Object: Application by the debtor seeking, pursuant to articles L.621-9 and L.622-7-II of the commercial code, authorisation to settle a dispute in accordance with the terms of a settlement agreement submitted to the overseeing judge.

SNP Boat Service, a société anonyme with share capital of Euros 1,655,500 with its registered office at boulevard de la Croisette, Port Canto, lots AX and AW, 06400 Cannes, registered with the Cannes company registry under number 300 774 791, represented by its president resident at the company's registered office,

Having as attorneys,

1°) Hervé Laroque, Paris Bar, of 118 rue de la Faisanderie, 75116 Paris (Tel: 01 40 72 22 22 – Fax: 01 45 03 35 65),

2°) Poulain & Associés, Jean-Paul Poulain and Philippe Chemouny, Paris Bar, of 46 avenue d'Iena, 75116 Paris (Tel : 01 53 23 43 00 – Fax : 01 53 23 43 09)

The above both representing the debtor for the purposes of this application,



Case
Hotel le St. James v
SNP
10-007794(18)

Exhibit
H
Translation of French
court documents

**EXHIBIT**
E

Have the honour to set out the following:

1.  Financiere LOV signed with SNP Boat Service, on 30 July 2008, a document entitled "declaration of intent" according to Financiere LOV and "letter of agreement" according to SNP Boat Service, to agree on the sale of a 43 m Leopard type motor yacht (hull n°2) to be built by Arno Shipyard in Pisa, Italy, for a price of Euros 14,500,000 and with a delivery date of 31 may 2009.

    That document indicates that the parties were to reach agreement on the provisions and detailed conditions of the contract no later that 15 September 2008.

    Confirmation conditions provided that the buyer was to pay a confirmation down payment of Euros 3,000,000 in consideration for the delivery by the seller of a Parent Company Guarantee issued by Rodriguez Group, no later than 31 July 2008.

    It was also stated that in the event that the parties should fail to conclude a sale contract, the seller would return the down payment at the first written demand of the purchaser.

    In the event of failure to reimburse the down payment, the agreement provided for a Euros 25,000 penalty per day starting from the sixth day after the declaration of intent lapsed.

2.  The confirmation down payment was made on 1 August 2008. In consideration for this payment, Rodriguez Group issued its guarantee.

    This guarantee provides, in particular that: "*on 30 July 2008, the purchaser and SNP Boat Service entered into a letter contract according to which the seller has agreed to build and deliver that yacht to the purchaser on condition that a final contract is arrived at and payment of a confirmation commission of Euros 3,000,000.*

    *The Guarantor declares that it shall be jointly and severally liable to the purchaser in respect of all the obligations of the seller resulting from the letter contract or relating to these obligations*".

3.  In fact, the sale never took place and the parties each consider that the other is responsible for this failure.

    According to Financiere LOV:

    -   The terms of payment of the price for the yacht were to take into account the part exchange of its second hand 43 m Leopard yacht;
    -   In addition, no contract was concluded for the sale of the 46 m Leopard.

    According to SNP Boat Service, the above mentioned agreement represents a binding sale contract and Financiere LOV wrongfully refused to sign the Leopard 43/02 sale purchase contract and remains bound to pay the balance of the purchase price or, in the alternative that no sale takes place, to pay SNP Boat Service damages in an amount at least equivalent to the down payment made.

By registered mail dated 2 October 2008, Financiere LOV demanded the restitution of the confirmation down payment from SNP Boat Service

SNP Boat Service refused.

By registered mail of 5 December 2008, Rodriguez Group was also asked to return the down payment. It too refused.

4.  Following unproductive summary proceedings, Financiere LOV obtained the court's authorisation to bring proceedings against SNP Boat Service before the Tribunal de Commerce of Cannes to seek the restitution of the Euros 3,000,000 down payment together with contractual penalties.

Financiere LOV considers that the declaration of intent of 30 July 2008 cannot in any way be treated as a sale contract but as a simple declaration of intent to conclude a future and potential sale contract.

SNP Boat Service and Rodriguez Group consider that the sale is perfect and the that the sale contract was concluded. They conclude that Financiere LOV must be found liable to pay the balance of the purchase price, i.e. the sum of Euros 11,500,000.

During the proceedings, the court opened safeguard proceedings in respect of both defendants, compelling the claimant to proceed in accordance article L.622-22 of the commercial code and declare its claim to the trustees in order to pursue its claim.

The matter is to be heard on 21 January 2010.

5.  Financiere LOV has declared a total claim of Euros 7,559,731 calculated as follows:

| | |
|---|---|
| - Principal | Euros 3,000,000 |
| - Interest at the legal rate from 2 October 2008 to 7 April 2009 | Euros 59,731 |
| - Delay interest since 8 April 2009 | |
| - Contractual penalties as at 7 April 2009 | Euros 4,500,000 |

The applicant contests all the heads of claim declared by Financiere LOV.

In addition, Financiere LOV has been appointed as overseeing creditor for SNP Boat Service and Rodriguez Group by order of the overseeing judge dated 8 September 2009.

6.  It is at that particular stage that the parties have agreed the terms of the settlement agreement submitted to the overseeing judge and to be made conditional on his approval.

That agreement provides, in essence

- the amicable resolution of the prior agreements which have led to this litigation
- the sale to Financiere LOV by SNP Boat Service of a Mangusta 108 Yacht named Foursome for a price of 4 million Euros payable as follows:

3 million Euros by way of set off against the claim against declared against SNP Boat Service, the latter and Rodriguez Group abandoning all contest in relation to this claim,

1 million Euros on delivery of the yacht in Miami (or the Bahamas), after joint acknowledgment that all technical work provided for in annex 1 to the settlement agreement has been completed. The sum of Euros 1,000,000 to be held in escrow until completion of all usual formalities and in particular until the delivery of the Bill of Sale and the sale invoice by the seller.

In addition, Financiere LOV agrees to appoint SNP Boat Service as central agent for the sale of the yacht which will allow it to receive, a price supplement in the form of commission if it arranges the sale of the yacht to a third party before 31 May 2010 for a price between 4 and 5 million Euros after deduction of costs of cosmetic work and sale costs incurred by the owner.

As part of this settlement, that parties each agree to desist from all claims and actions.

In particular, Financiere LOV accepts to desist from all its heads of claims declared save for the Euros 3,000,000 claim to allow for the set off against part of the purchase price of the Mangusta 108.

Conversely, SNP Boat Service and Rodriguez Group agree to desist from all contest raised in the process of verification of its debts by the court representative.

7.  This settlement agreement is in the interest of all the parties and those of SNP Boat Service as it allows:

- SNP to be free of any risk of having to accept the second hand 31 m Leopard yacht as part exchange
- To remove from SNP's stock at the current market price a Mangusta Yacht with significant maintenance costs.
  The settlement agreement therefore accords with the general objectives of the safeguard proceedings which are to reduce stock and associated costs
- To maintain a commercial relationship with an important client of SNP. As overseeing creditor, Financiere LOV knows that the overseeing judge has on many occasions had the opportunity to encourage settlement agreements of this type taking account of deposits paid and declared as claims in the safeguard proceedings.
  On this point, Financiere LOV considers, having seen the other settlement agreements which SNP Boat Service has been authorized to enter into with it main clients and with the Arno Shipyard, that the safeguard debt clearing plan presented by SNP Boat Service and Rodriguez Group has real prospects of success which encourages it to maintain commercial relations.
- To free Rodriguez Group from of its contractual guarantee obligations
- To put an end to lengthy and costly litigation which could continue for several years; the dispute is currently before the Tribunal de Commerce of Cannes and will be subject to appeal before the Court of Appeal of

Aix en Provence; in addition, the overseeing judge remains to decide on the claim declared by Financiere LOV and the contest raised
- To remove large claims from SNP's account

**This is why,**

The applicant requests that the overseeing judge, in accordance with the article referred to above, kindly authorize it to settle with Financiere LOV in accordance with the terms of the settlement agreement provided.

(…procedural wording designed to expedite the stay and dismissal of current proceedings…)

Cannes,
9 December 2009

Tribunal de Commerce of Cannes

N° PCL: 2009J00084                    N°RG : 2009M02165
Debtor SA Service Navigation de Plaisance Boat Service

## ORDER

By judgment dated 7 April 2009,

The tribunal de commerce of Cannes opened safeguard proceedings in relation to :

SA Service Navigation de Plaisance Boat Service
Bd de la Croisette Port Canto Lots AX et AW
06400 Cannes
RCS Cannes : 300774791 1974 B170
Legal representative : Alexandre Laurent Rodriguez, President

The tribunal appointed :

        -Pierre Cousin as overseeing judge
        - Didier Cardon as court representative
        - Pierre Louis Ezavin as co-administrator
        - M Bauland as co-administrator ;

This judgment was published in BODACC on 23 April 2009

SNP Boat Service has filed an application to be allowed to settle in accordance with article 622-7 of the commercial code following which the parties and the administrators appeared before the overseeing judge on 17 December 2009.

At that hearing, the following were present:

        - Maitre Laroque representing SNP
        - Maitre Ferran representing Financiere LOV
        - Miss Rodo, assistant of M Cardon
        - Pierre Louis Ezavin was not present
        - M Bauland was not present

Maitre Laroque confirmed the terms of his application of 9 December 2009 and asked the overseeing judge to authorise the settlement between SNP and Financiere LOV.

Me Ferran supported the request.

By a fax dated 14 December 2009 M Bauland gave a favourable opinion on the request.

By a fax dated 17 December 2009, M Ezavin acknowledged the conclusion of negotiations between the parties. However, he noted that the settlement agreement envisages the sale to Financiere LOV by SNP Boat Service of a Mangusta 108 yacht named Foursome for a price of Euros 4,000,000 payable by way of set off with the declared claim of Euros 3,000,000 and Euros 1,000,000 payable on delivery.

On condition that the seller provide documentation justifying the calculation of the price, the co-administrator expressed a favourable opinion.

SO:

Given that the transaction contemplated is clearly in the interest of the insolvency procedure and that it is appropriate to authorise it;

Given the favourable opinion of all the members of the procedure;

Given that it is appropriate to accept the request for authorisation to settle between SNP and Financiere LOV;

For these reasons:

We, M Pierre Couzin, Overseeing judge, assisted by Mrs Patricia Caredda F.F and by clerk la Selas Dany Van Sant;

Given article 622-7 of the commercial code;
Given the application made, the documents in support and having heard the parties;

Declare that the request is admissible and admitted;

Consequently:

Authorise SNP Boat Service to settle in the terms of the application made;

Say:

That the costs of this application shall be supported by the applicant;

Order notification of this decision by the clerks office

Cannes
17 December 2009

Arrivé au Greffe du Tribunal
de Commerce de Cannes, le

**- 9 DEC. 2009**

À MONSIEUR LE JUGE
COMMISSAIRE À LA
SAUVEGARDE DE LA SOCIETE
RODRIGUEZ GROUP

N°PCL : 2009J00083
Débiteur :
SOCIETE RODRIGUEZ GROUP
Jugement de Sauvegarde :
7 avril 2009
Juges commissaires :
Monsieur Pierre COUSIN
Monsieur Denis GARRONE
Administrateurs judiciaires :
Me Pierre-Louis EZAVIN
Me Eric BAULAND
Mandataire judiciaire :
Me Didier CARDON

Affaire :
RODRIGUEZ GROUP
c/ FINANCIERE LOV

---

## REQUÊTE
### AUX FINS D'AUTORISER UNE TRANSACTION

---

**OBJET: requête du débiteur sollicitant, dans le cadre des dispositions des articles L. 621-9 et L. 622-7-II du Code de commerce, l'autorisation de transiger dans les termes des accords soumis à Monsieur le Juge Commissaire.**

La société **RODRIGUEZ GROUP**, Société Anonyme au capital de 1.750.000 €, dont le siège social est situé Bd de la Croisette Port Canto, 06400 Cannes, inscrite au Registre du Commerce et des Sociétés de Cannes sous le numéro 697 220 879, légalement représentée par son Président en exercice domicilié en cette qualité audit siège et assistée de ses Administrateurs judiciaires,

Ayant pour Avocats,

**1°) Maître Hervé LAROQUE**, Avocat au Barreau de Paris, dont le Cabinet est situé 118, rue de la Faisanderie, 75116 Paris (Tél. : 01 40 72 22 22 – Fax : 01 45 03 35 65),

**2°) Le Cabinet POULAIN & Associés**, Maîtres Jean-Paul POULAIN et Philippe CHEMOUNY, Avocats au Barreau de Paris, dont le Cabinet est situé 46, avenue d'Iéna, 75116 Paris (Tél. : 01 53 23 43 00 – Fax : 01 53 23 43 09),

Lesquels se constituent sur la présente requête et ses suites,

ONT L'HONNEUR DE VOUS EXPOSER CE QUI SUIT :

**1.** La société FINANCIERE LOV (ci-après désignée FINANCIERE LOV) a signé avec la société SNP BOAT SERVICE (ci-après désignée SNP BOAT), le 30 juillet 2008, un document dénommé « déclaration d'intention » selon FINANCIERE LOV et « lettre d'accord » selon SNP BOAT, pour convenir de la vente d'un yacht à moteur personnalisé, de la catégorie LEOPARD, d'une longueur de 43 mètres (coque n° 2), devant être construit par les chantiers navals du constructeur ARNO, sis à Pise, en Italie, moyennant le prix de 14.500 000 €, avec une date de livraison fixée au 31 mai 2009 (**pièce 1**).

Ce document précise que les parties doivent parvenir à un accord sur les dispositions et les conditions particulières du contrat, au plus tard le 15 septembre 2008.

Les conditions de confirmation prévoyaient que l'acquéreur doit verser un acompte de confirmation de 3.000.000 €, contre remise par le vendeur d'une garantie de la société mère RODRIGUEZ GROUP, au plus tard le 31 juillet 2008.

Il fut par ailleurs précisé que si les parties ne parvenaient pas à conclure un contrat de vente, le vendeur devra restituer l'acompte, à première demande écrite de l'acquéreur.

En cas de non remboursement, il fut stipulé une pénalité de 25.000 € par jour, à compter de l'expiration du délai de 5 jours ouvrables, suivant la date à laquelle la déclaration d'intention est devenue nulle et non avenue.

**2.** L'acompte de confirmation a été versé le 1er août 2008 à SNP BOAT (**pièce 2**). En contrepartie de ce règlement, RODRIGUEZ GROUP a donné sa garantie (**pièce 3**).

Cette garantie dispose notamment que : *« Le 30 juillet 2008, l'Acquéreur et SNP BOAT SERVICE S.A ont conclu une lettre contrat aux termes de laquelle le Vendeur s'est engagé à construire et livrer le yacht à l'Acquéreur, sous réserve de la finalisation du contrat et du cahier des charges, ainsi que du paiement d'une commission de confirmation de 3.000.000 €.*

*La Caution déclare par les présentes se porter caution solidaire et indivisible en faveur de l'acquéreur, au titre de l'ensemble des obligations du vendeur découlant de la LC (lettre contrat) ou en rapport avec celles-ci ».*

**3.** En définitive, la vente n'est pas intervenue, les parties s'imputant mutuellement la responsabilité de cet échec.

Selon FINANCIERE LOV :

- les modalités de paiement du prix du yacht à construire intégrait la reprise de son yacht LEOPARD d'occasion, d'une longueur inférieure de 31 mètres ;

- en outre, aucun accord n'aurait été conclu pour parvenir à la vente du bateau LEOPARD de 46 mètres.

Selon SNP BOAT, l'accord précité emporte vente dès lors qu'il constate un accord réciproque sur la chose et sur le prix, de sorte que FINANCIERE LOV s'est opposée, dans des conditions fautives, à la signature du contrat d'achat du LEOPARD 43/02 et demeure

- 3 -

débitrice du solde du prix ou, à défaut de vente, de dommages et intérêts d'un montant au moins équivalent à l'acompte réglé par FINANCIERE LOV.

Par courrier recommandé AR du 2 octobre 2008, FINANCIERE LOV a mis en demeure SNP BOAT d'avoir à procéder à la restitution de l'acompte de confirmation.

SNP BOAT s'y est opposée.

Par courrier RAR du 5 décembre 2008, la société mère RODRIGUEZ GROUP a également été mise en demeure de restituer l'acompte. Cette dernière s'y est pareillement opposée.

4. Après une procédure de référé infructueuse, FINANCIERE LOV a été autorisée, au mois de décembre 2008, à faire assigner à bref délai la requérante, devant le Tribunal de commerce de Cannes, aux fins de l'entendre condamnée solidairement avec SNP BOAT, à restituer l'acompte de 3.000.000 €, outre des pénalités contractuelles (**pièce 4**).

FINANCIERE LOV estime en effet que la déclaration d'intention du 30 juillet 2008 ne peut en aucune manière s'analyser en un contrat de vente, mais en une simple déclaration d'intention de contracter un futur et éventuel contrat de vente.

SNP BOAT et RODRIGUEZ GROUP estiment que la vente est parfaite, et que le contrat de vente a été conclu. Elles en déduisent que FINANCIERE LOV doit être condamnée à verser le solde du prix de vente, soit la somme de 11.500.000 €.

En cours d'instance, le Tribunal a ouvert une procédure de sauvegarde à l'égard des défenderesses, ce qui a contraint la demanderesse à effectuer les formalités de l'article L. 622-22 du Code de commerce, pour pouvoir poursuivre l'instance introduite antérieurement à l'ouverture de la sauvegarde, aux fins de fixation de sa créance au passif des sociétés en sauvegarde.

Après plusieurs renvois, l'affaire devrait être plaidée le 21 janvier 2010.

5. Parallèlement, FINANCIERE LOV a déclaré au passif de SNP BOAT et de RODRIGUEZ GROUP une créance d'un montant total de **7.559.731 €**, ventilée comme suit (**pièces 5 et 6**) :

| | | |
|---|---|---|
| - | Principal | 3.000.000 €, |
| - | Intérêts de retard au taux légal du 2/10/08 au 7/04/09 | 59.731 €, |
| - | Intérêts de retard à compter du 8/04/09 | mémoire, |
| - | Pénalités contractuelles de retard au 7 avril 09 | 4.500.000 €. |

La requérante conteste tous les chefs de créance déclarés par FINANCIERE LOV.

FINANCIERE LOV a par ailleurs été désignée en qualité de créancier contrôleur de SNP BOAT et de RODRIGUEZ GROUP par ordonnances de Monsieur le Juge commissaire en date du 8 septembre 2009.

6. C'est à ce stade précis des procédures contentieuses que les parties se sont rapprochées pour définir les modalités de l'accord transactionnel soumis à Monsieur le Juge Commissaire et convenu sous condition suspensive de son autorisation (**pièce 7**).

Ce protocole prévoit en synthèse :

- la résolution amiable des accords antérieurs faisant l'objet du litige ;

- la cession au profit de FINANCIERE LOV par SNP BOAT, d'un yacht de la catégorie MANGUSTA 108 dénommée FOURSOME, moyennant le prix de 4.000.000 € payable de la manière suivante,

  3.000.000 €, par compensation avec la créance déclarée au passif de SNP BOAT, cette dernière ainsi que RODRIGUEZ GROUPE renonçant expressement à cet effet, de manière définitive et irrévocable, aux contestations se rapportant à ce chef de créance déclaré par FINANCIERE LOV.

  1.000.000 €, au jour de la livraison du bateau à Miami (ou aux Bahamas), après constatation contradictoire de la réalisation de la totalité des travaux techniques prévus à l'annexe 1 du protocole, étant précisé que la somme de 1.000.000 €, sera consignée dans l'attente de l'accomplissement des formalités habituelles en pareille matière et notamment de la remise au vendeur du certificat de vente (*Bill of sale*) notarié et apostillé et de la facture de vente.

FINANCIERE LOV donne par ailleurs mandat de vente et agence centrale du yacht ainsi acquis à SNP BOAT, dans des conditions qui permettent à cette dernière de percevoir, le cas échéant, un complément de prix sous forme de commission, si elle parvient à revendre le navire à un tiers pendant un délai expirant le 31 mai 2010, moyennant une somme comprise entre 4 et 5 millions d'euros, après déduction du coût des travaux esthétiques et des frais de vente exposés par le propriétaire FINANCIERE LOV.

Dans le cadre de cette transaction, les parties renoncent réciproquement à toutes instances et actions.

FINANCIERE LOV renonce en particulier à l'intégralité de ses chefs de créances déclarés au passif de SNP BOAT et de RODRIGUEZ GROUP, à l'exception de la créance d'acompte de 3.000.000 € déclarée au passif de SNP BOAT, pour permettre le paiement par compensation d'une partie du prix du yacht MANGUSTA 108.

Réciproquement, SNP BOAT et RODRIGUEZ GROUP renoncent à toutes contestations soulevées à l'occasion de la vérification de leur passif à l'Etude de Maître CARDON ès qualités de Mandataire judiciaire.

7. De toute évidence, ce protocole sert les intérêts respectifs des parties et ceux de SNP BOAT, dans la mesure où il permet :

- **de libérer SNP BOAT de tout risque de reprise, dans les conditions excipées par FINANCIERE LOV, du yacht d'occasion LEOPARD 31 ;**

- **de sortir des stocks de SNP BOAT, selon les prix actuels du marché, un yacht MANGUSTA dont les charges d'entretiens sont importantes ;**

  le protocole est conforme ainsi aux objectifs généraux de la sauvegarde qui visent à limiter les stocks de bateaux neufs et d'occasion et corrélativement les charges d'exploitations occasionnés par leur gardiennage et leur entretien ;

- **de maintenir une relation commerciale avec un client important de la SNP BOAT** ; à cet égard, en sa qualité de créancier contrôleur, FINANCIERE LOV n'ignore pas que Monsieur le Juge commissaire a eu l'occasion d'encourager et

autoriser des accords de ce type, stipulant la vente de navires, en tenant compte, dans le cadre des modalités de paiement du prix, des acomptes versés antérieurement à l'ouverture de la sauvegarde et déclarés au passif des requérantes ;

FINANCIERE LOV considère sur ce point, connaissance prise en sa qualité de contrôleur, des accords transactionnels que SNP BOAT a été autorisée à signer, d'une part, avec ses principaux clients et, d'autre part, avec les chantiers navals ARNO, que le plan de sauvegarde et d'apurement du passif présenté par SNP BOAT et les sociétés du Groupe RODRIGUEZ en sauvegarde présente des chances sérieuses de réalisation qui ne peuvent que l'encourager à maintenir des relations commerciales avec les requérantes ;

- **de libérer la société holding RODRIGUEZ GROUP de toute obligation de garantie contractuelle ;**

- **de mettre un terme à des procédures contentieuses longues et couteuses qui pourraient encore perdurer pendant plusieurs années** ; il sera sur ce point rappeler que le litige fait actuellement l'objet d'une procédure contentieuse devant le Tribunal de commerce de Cannes, susceptible d'appel devant la Cour d'Aix-en-Provence ; en outre, FINANCIERE LOV ayant répondu dans le délai de trente jours qui lui étaient impartis aux contestations notifiées par Maître CARDON, deux procédures contentieuses supplémentaires, en fixation de créances contestées devront être portées devant Monsieur le Juge commissaire ;

- **de supprimer des chefs de créances importants, déclarés à hauteur de la somme de 7.559.731 € et qui grèvent actuellement les états du passif des sociétés SNP BOAT et RODRIGUEZ GROUP.**

C'EST POURQUOI,

L'exposante requière qu'il plaise à Monsieur le Juge Commissaire, en application des articles susvisés, de bien vouloir l'autoriser à transiger avec la société FINANCIERE LOV, dans les termes du protocole d'accord qui vous est soumis.

**Compte tenu des termes des accords qui impliquent qu'ils soient mis en œuvre à bref délai, afin de mettre un terme aux procédures contentieuses en cours, la requérante accepte expressément de comparaître à la plus proche audience de Monsieur le Juge Commissaire.**

**La société FINANCIERE LOV accepte également de comparaître spontanément, ainsi qu'en atteste la lettre officielle de leur Conseil jointe à la présente requête (pièce 8), en renonçant aux délais ordinaires de convocation.**

Fait à Cannes
Le  9 Décembre 2009

TRIBUNAL DE COMMERCE
DE CANNES

1   ... 2009

N° PCL . 2009J00083
Débiteur  RODRIGUEZ GROUP SA

N° RG : 2009M02198

## ORDONNANCE

Par jugement en date du 7 AVRIL 2009,

Le Tribunal de Commerce de CANNES a ouvert une procédure de Sauvegarde,

A l'égard de :
RODRIGUEZ GROUP SA
Bd De La Croisette Port Canto
06400 CANNES
RCS CANNES  697220879 – 1991B423
Représentant légal : M. Alexandre Laurent RODRIGUEZ Président du directoire

Le Tribunal a désigné :
- M. Pierre COUSIN en qualité de juge commissaire,
- Me Didier CARDON en qualité de mandataire judiciaire,
- Me Pierre Louis EZAVIN en qualité de co-administrateur ;
- Me BAULAND en qualité de co-administrateur ;

Ledit jugement publié au BODACC en date du 23 Avril 2009 ;

La SA. RODRIGUEZ GROUP Bd de la Croisette Port Canto 06400 CANNES a déposé une requête en vue de compromettre ou transiger conformément à l'article 622-7 du Code de Commerce, à la suite de quoi les parties et les organes de la procédure sont intervenus volontairement devant le juge Commissaire à l'audience du 17 Décembre 2009 ;

Lors de l'audience, étaient présents ou représentés :

- Maître LAROQUE aux intérêts de la SA RODRIGUEZ GROUP ,
- Maître FERRAN aux intérêts de la société FINANCIERE LOV ,
- Mlle RODO collaboratrice de Me Didier CARDON ,
- Me Pierre Louis EZAVIN a fait défaut ;
- Me BAULAND a fait défaut ;

Maître LAROQUE confirme les termes de sa requête du 9 Décembre 2009 et demande au juge-commissaire de bien vouloir autoriser la transaction entre la SA RODRIGUEZ GROUP et la société FINANCIERE LOV.

Maître FERRAN s'associe à la demande présentée.

Par télécopie en date du 14 Décembre 2009 Maître BAULAND donne un avis favorable à la présente requête.

PC

Par télécopie en date du 17 Décembre 2009 Maitre EZAVIN prend acte de l'aboutissement des négocations poursuivies entre les parties. Cependant, concernant plus particulièrement cette transaction, il constate que le protocole transactionnel, tel que présenté dans la requête initiale prévoit : la cession au profit de FINANCIERE LOV par SNP BOAT SERVICE d'un yacht de la catégorie MANGUSTA 108 dénommé FOURSOME, moyennant le prix de 4.000.000 € payable par compensation avec la créance déclarée au passif par le client (3.000.000 €), le solde étant versé à la livraison du navire (1.000.000 €).

Sous réserve de la production par la société venderesse permettant de justifier les modalités de calcul du prix de cession retenu, le co-administrateur judiciaire exprime un avis favorable à la transaction intervenue.

**SUR CE :**

Attendu que la transaction envisagé présente un intérêt certain pour le bon déroulement de la procédure collective dont s'agit et qu'il convient d'y faire droit ;

Vu l'avis favorable de l'ensemble des organes de la procédure ;

Attendu qu'il y a donc lieu de faire droit à la présente demande d'autorisation de transaction entre la SA RODRIGUEZ GROUP et la société FINANCIERE LOV ;

**PAR CES MOTIFS :**

Nous, M. Pierre COUSIN, Juge Commissaire, assisté de Mme Patricia CAREDDA F F de Greffier de la SELAS Dany VAN SANT ;
Vu l'article 622-7 du code de Commerce ;
Vu la requête qui précède, les pièces à l'appui, et les parties entendues en leurs explications ;

La déclarons recevable et bien fondée et disons qu'il convient d'y faire droit ;

**En conséquence :**

Autorisons la SA RODRIGUEZ GROUP à transiger dans les termes de la requête qui nous a été présentée ;

**Disons :**

Que les frais et dépens de la présente instance seront supportés par le requérant ;

Ordonnons la notification de la présente par les soins du Greffe conformément à l'article R 621-21 du code de Commerce.

A Cannes en date du 17 Décembre 2009

Le Juge Commissaire                          Le Greffier

M. Pierre COUSIN                             Mme Patricia CAREDDA

**<u>EXHIBIT D</u>**

*Inventory of Assets filed in the Sauvegarde*

**François ISSALY**
**Julien PICHON**
Commissaires-priseurs Judiciaires

*Déposé au Greffe du Tribunal de Commerce de Cannes, le 17 JUIL. 2009*

# INVENTAIRE DE L'ACTIF MOBILIER

## DEPENDANT DE LA

## PROCEDURE DE SAUVEGARDE DE JUSTICE DE LA

### SA RODRIGUEZ GROUP (Holding)
### Boulevard de la Croisette
### Port Canto
### 06400 CANNES

Dressé entre le 27 avril 2009 et le 17 juillet 2009
en présence du gérant, Monsieur Alexandre RODRIGUEZ

Par Maîtres François ISSALY & Julien PICHON
Commissaires-priseurs judiciaires à CANNES
31 Boulevard d'Alsace

Maître Pierre-Louis EZAVIN
Administrateur Judiciaire à NICE
1 rue Alexandre Mari

Et

Maître BAULAND
Administrateur Judiciaire à LYON
40, rue Bonnel

Désignés en qualité d'Administrateurs et co-Administrateurs Judiciaires de la
SA RODRIGUEZ GROUP, par Jugement du Tribunal de Commerce de CANNES
en date du 07.04.2009.

Représentant des Créanciers
**Maître Didier CARDON**
Mandataire Judiciaire au CANNET
15, Impasse de l'Horloge

PCL N° 2009J00683

Copie certifiée conforme
LE GREFFIER,



Hôtel des Ventes - 31 Boulevard d'Alsace - 06400 CANNES
Tél. - 04 93 39 01 35.    fax – 04 93 68 28 32
**j.pichon@wanadoo.fr**

**François ISSALY**
**Julien PICHON**
Commissaires Priseurs judiciaires
31 boulevard d'Alsace
06400 CANNES
Téléphone : 04 93 39 01 35
Télécopie : 04 93 68 28 32
**j.pichon@wanadoo.fr**

**TRIBUNAL DE COMMERCE DE CANNES**
**19 BOULEVARD CARNOT**
**06400 CANNES**

**Jugement du :07.04.2009.**

**Nos réf : 2009/069**
**SDJ SARL SA RODRIGUEZ GROUPE (Holding)**

Cannes, le 24.juillet 2009

Monsieur le Président,

Dans le cadre de la Sauvegarde de Justice de la SA RODRIGUEZ GROUPE (Holding), nous vous informons que celle-ci ne possède aucun actifs mobiliers, uniquement des droits incorporels (clauses de non concurrence).

Vos bien dévoués,

Maîtres François ISSALY et Julien PICHON

**François ISSALY**
**Julien PICHON**
Commissaires-priseurs Judiciaires

*080 1433*

INVENTAIRE DE L'ACTIF MOBILIER

*Déposé au Greffe du Tribunal de Commerce de Cannes, le*

DEPENDANT DE LA

*27 Juil. 2009*

PROCEDURE DE SAUVEGARDE DE JUSTICE DE LA

## SA SERVICE DE NAVIGATION DE PLAISANCE
## BOAT SERVICE
## Boulevard de la Croisette
## Port Canto
## 06400 CANNES

Dressé entre le 27 avril 2009 et le 17 juillet 2009
en présence du gérant, Monsieur Alexandre RODRIGUEZ

Par Maîtres François ISSALY &  Julien PICHON
Commissaires-priseurs Judiciaires à CANNES
31 Boulevard d'Alsace

Maître Pierre-Louis EZAVIN
Administrateur Judiciaire à NICE
1 rue Alexandre Mari

Et

Maître BAULAND
Administrateur Judiciaire à LYON
40, rue Bonnel

Désignés en qualité d'Administrateurs et co-Administrateurs Judiciaires de la
SA SNP BOAT SERVICE, par Jugement du Tribunal de Commerce de CANNES
en date du 07.04.2009.

Représentant des Créanciers
**Maître Didier CARDON**
Mandataire Judiciaire au CANNET
15, Impasse de l'Horloge

Copie certifiée conforme

LE GREFFIER,

**PCL N°2009J00084**

Hôtel des Ventes - 31 Boulevard d'Alsace - 06400 CANNES
Tél. - 04 93 39 01 35.   fax – 04 93 68 28 32
j.pichon@wanadoo.fr

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## MATÉRIEL DE BUREAU ET INFORMATIQUE

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **PORT CANTO - CANNES** | | |
| - 1 borne d'accueil en stratifié faux bois avec dalle de verre | | |
| * 1 table de conférence en placage d'acajou | | |
| * 2 canapés avec 4 fauteuils cuir | | |
| * 14 fauteuils traineau | | |
| * 8 fauteuils de direction en cuir | | |
| * 11 sièges dactylo | | |
| * 4 chaises accueil capitonnées | 2 700 € | 900 € |
| | | |
| - 10 bureaux avec retour | | |
| * 2 bureaux en bois rectangulaires | | |
| * 1 bureau carré | | |
| * 2 bureaux | | |
| * 6 casiers roulants en stratifié faux bois | | |
| | | |
| - 1 table basse avec plateau verre | | |
| * 4 meubles en enfilade en stratifié faux bois | | |
| * 1 meuble bas avec étagères en stratifié faux bois | | |
| * 2 meubles bas à 2 portes en stratifié faux bois | | |
| * 1 meuble bas en mélaminé noir | | |
| * 2 meubles bas | | |
| * 1 grande armoire en stratifié faux bois | | |
| * 1 armoire haute à volets coulissants en stratifié faux bois | | |
| * 1 armoire à hauteur d'appui à 2 portes en stratifié faux bois | | |
| * 1 armoire à porte coulissante en stratifié faux bois | | |
| | | |
| - 1 armoire informatique avec serveur | | |
| | | |
| - 1 système de vidéo surveillance avec écran mobile TV et caméra | | |
| | | |
| - 1 système d'alarme DELTA PRO | | |
| | | |
| - 1 central téléphonique SIEMENS avec autocommutateur comprenant : | | |
| * 1 poste standard | | |
| * 16 postes annexes | | |
| | | |
| - 1 micro ordinateur ACER avec écran plat | | |
| * 3 ordinateurs portatifs IBM (anciens modèles) | | |
| * 1 ordinateur portatif SONY VAIO (grand modèle) | | |
| * 1 ordinateur portatif SONY VAIO | | |
| * 8 micro ordinateurs DELL avec écran plat DELL | | |
| * 2 micro ordinateurs assemblage Pentium 4 avec écran plat DELL | 9 550 € | 2 750 € |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## MATÉRIEL DE BUREAU ET INFORMATIQUE (suite)

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| - 1 imprimante couleur HP Color Laserjet 2605 | | |
| * 2 imprimantes couleur HP Color Laserjet 3800 | | |
| * 1 imprimante CANON Pixma IP3500 | | |
| * 2 imprimantes LEXMARK T 630 | | |
| * 1 imprimante LEXMARK T 614 | | |
| * 1 imprimante EPSON C 2600 | | |
| * 2 imprimantes EPSON Stylus D 88 | 1 200 € | 400 € |
| | | |
| - 1 photocopieur sur stand XEROX | | |
| * 2 télécopieurs CANON Fax L 2000 Super G3 | | |
| * 1 scaner à plat.EPSON | | |
| * 1 scaner FUJITSU FI 5120 C | | |
| * 1 destructeur de documents | 1 590 € | 530 € |
| | | |
| **Agencement d'une cuisine aménagée et équipée, devenu immeuble par destination et comprenant :** | | |
| - 1 réfrigérateur | | |
| * 1 micro ondes SAMSUNG | | |
| * 1 machine à café KRUPS NESPRESSO | | |
| | | |
| - 1 lot de lampadaires halogènes et objets de décorations | | |
| | | |
| - 3 extincteurs SICLI | 540 € | 80 € |
| | | |
| **SAV - PORT CANTO - CANNES** | | |
| | | |
| - 3 bureaux en stratifié faux bois avec retour informatique | | |
| * 3 casiers roulants | | |
| | | |
| - 4 chaises accueil | | |
| * 1 chaise dactylo | | |
| * 1 meuble bas à 3 portes | | |
| * 1 armoire à 2 portes en stratifié faux bois | | |
| * 1 canapé en rotin | | |
| * 1 table basse | | |
| | | |
| - 1 ordinateur portatif SONY VAIO (petit modèle) | | |
| * 1 ordinateur portatif IBM T 60 (ancien modèle, environ 2 ans) | | |
| * 1 micro ordinateur DELL avec écran plat, clavier et souris | 1 170 € | 390 € |
| | | |
| - 1 imprimante CANON Super G3 | | |
| * 1 imprimante CANON | | |
| * 1 destructeur de documents | | |
| * 1 scaner à plat | | |
| * 5 VHF (T. Walki) | | |
| * 1 téléviseur PHILIPS (ancien modèle) | 540 € | 180 € |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## MATERIEL DE BUREAU ET INFORMATIQUE (suite)

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| - 1 installation téléphonique SIEMENS comprenant :<br>* 3 postes SIEMENS | 100 € | mémoire |
| - 1 machine à café MAGIMIX<br>* 1 réfrigérateur table top THOMSON<br>* 1 lot de 6 encadrements<br>* 1 petit coffre fort MOTURA, fixé au mur | 180 € | 60 € |
| **PALAIS NAPOLEON - GOLFE JUAN** | | |
| **Hall**<br>- 1 borne d'accueil en verre dépoli avec retour<br>* 1 fauteuil de direction<br>* 1 canapé en cuir à 3 places<br>* 1 canapé en cuir à 2 places<br>* 1 table basse en verre | 1 050 € | 350 € |
| - 1 écran téléviseur BANG & OLUFSEN (ancien modèle)<br>* 1 chaine laser BANG & OLUFSEN avec 2 enceintes | 900 € | 300 € |
| - 1 micro ordinateur DELL Pentium 4 avec écran SONY, clavier et souris<br>* 1 imprimante HP Officejet 7410 | 360 € | 120 € |
| - 2 tapis mécaniques<br>* 1 lot d'encadrements (6)<br>* 6 pots en terre cuite pour plantes vertes | 180 € | 60 € |
| **Bureaux - RDC**<br>- 2 bureaux en stratifié faux bois avec retour<br>* 1 bureau demi ministre avec bords arrondis en stratifié faux bois<br>* 1 table ronde<br>* 2 casiers roulants<br>* 2 meubles bas à 4 portes<br>* 1 meuble bas de rangement<br>* 1 grande armoire de rangement<br>* 4 fauteuils enveloppants<br>* 1 fauteuil de direction<br>* 2 fauteuils traineau<br>* 1 siège dactylo<br>* 1 siège accueil | 450 € | 150 € |
| - 2 micro ordinateurs DELL Pentium 4 avec écrans SONY, claviers et souris<br>* 1 imprimante CANON Pixma MP 500<br>* 1 télécopieur BROTHER Fax 2820 | 750 € | 250 € |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## MATERIEL DE BUREAU ET INFORMATIQUE (suite)

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **Show-Room** | | |
| - 1 grande table de conférence en chêne cérusé de forme demi lune | 1 500 € | 500 € |
| * 4 tables bureau en stratifié faux bois | | |
| * 2 bureaux demi ministre en stratifié faux bois | | |
| * 1 bureau informatique | | |
| * 2 bureaux en mélaminé dont 1 avec retour | | |
| * 1 table informatique | | |
| * 1 canapé avec 2 poufs | | |
| * 3 casiers roulants en stratifié faux bois | | |
| * 1 console en stratifié faux bois | | |
| * 1 table basse en stratifié faux bois | | |
| * 3 tables de présentation en bois peint en blanc | | |
| * 4 armoires de rangement en stratifié faux bois | | |
| * 1 meuble bas de rangement avec casiers et tiroirs | | |
| * 1 meuble bas à volets coulissants | | |
| * 4 meubles de rangement à hauteur d'appui en stratifié faux bois | | |
| * 1 meuble informatique en stratifié faux bois | | |
| * 5 meubles à casiers carrés | | |
| * 1 meuble à dossiers suspendus à 4 tiroirs | | |
| * 1 étagère en mélaminé | | |
| * 1 fauteuil de direction | | |
| * 2 fauteuils "Club" | | |
| * 3 fauteuils dactylo | | |
| * 3 sièges dactylo | | |
| * 12 fauteuils sur roulettes | 1 800 € | 600 € |
| - 3 micro ordinateurs DELL Pentium 4 avec écran plat, clavier et souris | | |
| * 1 ordinateur portatif DELL Centrino | 1 080 € | 360 € |
| - 1 imprimante CANON BP3360 | | |
| * 1 imprimante sur stand XEROX Wordcenter 24 | | |
| * 1 télécopieur PANASONIC (ancien modèle) | | |
| * 1 relieuse | 600 € | 200 € |
| - 1 armoire informatique équipée | 500 € | mémoire |
| **Agencement d'une cuisine aménagée et équipée, devenu immeuble par destination et comprenant :** | | |
| - 1 lave vaisselle SIEMENS | | |
| * 1 four SIEMENS | | |
| * 1 machine à café MAGIMIX | | |
| * 1 bouilloire | | |
| * 4 sièges | 450 € | 150 € |

François ISSALY
Julien PICHON
Commissaires-Priseurs Judiciaires

## MATERIEL DE BUREAU ET INFORMATIQUE (suite)

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **A l'Etage - Bureaux** | | |
| Agencement du bureau de direction en chêne cérusé, devenu immeuble par destination | mémoire | mémoire |
| | | |
| - 1 grande table console en chêne cérusé | | |
| * 3 bureaux en stratifié faux bois | | |
| * 3 bureaux avec retour en stratifié faux bois | | |
| * 1 bureau avec dessus verre | | |
| * 1 grand bureau avec retour en stratifié faux bois | | |
| * 4 caissons roulants en stratifié faux bois | | |
| * 1 meuble bas à portes et tiroirs en stratifié faux bois | | |
| * 2 meubles bas de rangement en stratifié faux bois | | |
| * 1 meuble de rangement à hauteur d'appui | | |
| * 1 armoire à 3 portes en stratifié faux bois | | |
| * 2 armoires de rangement en stratifié faux bois | | |
| * 1 meuble vitrine en stratifié faux bois | | |
| * 1 canapé en cuir à 3 places | | |
| * 1 canapé en cuir à 2 places | | |
| * 3 petits guéridons | | |
| * 1 table basse avec plateau verre | | |
| * 2 fauteuils de direction | | |
| * 4 fauteuils accueil | | |
| * 5 chaises dactylo | | |
| * 1 siège en cuir | | |
| * 7 sièges traineau | 2 640 € | 880 € |
| | | |
| - 1 téléviseur écran plat PIONEER et son meuble | | |
| * 1 ordinateur portatif SONY VAIO (grand écran) | | |
| * 3 micro ordinateurs DELL Core 2 (dont 1 Pentium C) | | |
| * 3 micro ordinateurs DELL Pentium 4 | | |
| * 1 micro ordinateur HP Pavillon 1329 avec 2 écrans plats SONY | | |
| * 1 imprimante HP Laserjet 3600 | | |
| * 1 imprimante HP Laserjet 2100 | | |
| * 1 imprimante HP Laserjet P 2015 (ancien modèle) | | |
| * 1 imprimante HP Color Laserjet 4650 | | |
| * 1 télécopieur CANON Fax L 2000 | | |
| * 1 destructeur de documents DAHLE | | |
| * 1 tapis mécanique | 2 700 € | 900 € |
| | | |
| - 1 installation téléphonique SIEMENS comprenant : | | |
| * 1 standard avec une vingtaine de postes annexes | 500 € | mémoire |
| | | |
| - 1 système de vidéo surveillance comprenant : | | |
| * 2 caméras | | |
| * 1 écran de contrôle | 300 € | mémoire |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## MATERIEL DE BUREAU ET INFORMATIQUE (suite)

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **Salle de Réunion** | | |
| - 1 grande table de conférence en bois | | |
| * 8 sièges de direction | | |
| * 3 petits guéridons circulaires | 600 € | 200 € |
| | | |
| **Local Technique** | | |
| - 1 armoire à portes coulissantes | | |
| * 1 imprimante XEROX Document Center (ancien modèle) | | |
| * 1 télécopieur CANON Super G3 | 300 € | 100 € |
| | | |
| **Non visualisé (salle informatique)** | | |
| - 1 armoire informatique | | |
| * 1 serveur | mémoire | mémoire |
| | | |
| **Sur désignation : Bureau de M. CHOKRON** | | |
| - 1 bureau | | |
| * 1 fauteuil de direction | | |
| * 2 sièges accueil | | |
| * 1 ordinateur portatif | 900 € | 300 € |
| | | |
| **BUREAU DE ST TROPEZ (sur désignation)** | | |
| - 2 bureaux | | |
| * 6 fauteuils | | |
| * 1 canapé | | |
| * 1 table basse | | |
| * 6 meubles bas | | |
| * 1 console | | |
| * 4 lampes de bureau | | |
| * 1 bar | | |
| * 1 machine à café | | |
| * 1 micro ondes | 600 € | 200 € |
| | | |
| - 1 micro ordinateur DELL Optiplex GX 620 avec écran plat, clavier et souris | | |
| * 1 ordinateur portable DELL Lattitude D 830 | | |
| * 1 imprimante EPSON Stylus Photo 925 | | |
| * 1 imprimante CANON IP 5300 | | |
| * 1 scaner CANON Lide 600 F | | |
| * 1 boyeur à papier Idéal 2402 | 900 € | 300 € |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

### MATÉRIEL DE BUREAU ET INFORMATIQUE (suite)

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **PORT DE GOLFE JUAN (2 locaux)** | | |
| | | |
| **Hall** | | |
| - 1 comptoir accueil en stratifié faux bois dessus verre | | |
| * 1 bureau avec retour en bois peint | | |
| * 1 bureau en pin | | |
| * 1 comptoir bar avec dessus verre | | |
| * 1 canapé à 3 places en tissus | | |
| * 2 canapés à 2 places en tissus | | |
| * 1 table basse avec dalle verre | | |
| * 1 fauteuil de direction en cuir | | |
| * 2 chaises accueil traineau en cuir | | |
| * 2 meubles de rangement à 2 portes en stratifié faux bois | 1 800 € | 600 € |
| | | |
| **Salle de Réunion et bureaux** | | |
| - 1 table de conférence | | |
| * 2 bureaux en bois | | |
| * 1 bureau de direction en bois | | |
| * 2 bureaux en enfilade | | |
| * 1 bureau en bois avec retour | | |
| * 3 bureaux en bois | | |
| * 1 canapé à 2 places en tissus | | |
| * 1 canapé à 2 places en cuir beige | | |
| * 1 canapé à 1 place en cuir beige | | |
| * 1 armoire à hauteur d'appui à 3 portes en stratifié faux bois | | |
| * 1 armoire à 2 corps à 2 portes en haut et 2 portes en bas en stratifié faux bois | | |
| * 2 fauteuils en daim | | |
| * 4 fauteuils de direction en cuir | | |
| * 2 casiers roulants à tiroirs | | |
| * 4 chaises hautes en bois | | |
| * 2 chaises dactylo | | |
| * 7 chaises en cuir | | |
| * 9 chaises accueil traineau en cuir | | |
| * 3 casiers de rangement en bois | | |
| * 1 lampe de bureau ARTEMIDE | | |
| * 1 écran rétroprojecteur SONY | 4 500 € | 1 500 € |
| | | |
| - 1 installation téléphonique SIEMENS comprenant : | | |
| * 1 poste standard SIEMENS | | |
| * 9 postes annexes SIEMENS | 500 € | mémoire |

François ISSALY
Julien PICHON
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## MATERIEL DE BUREAU ET INFORMATIQUE (suite)

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **PORT DE GOLFE JUAN (2 locaux)** | | |
| **(suite)** | | |
| - 6 micro ordinateurs DELL avec écran plat DELL | | |
| * 1 ordinateur portatif FUJITSU SIEMENS (ancien modèle) | 1 800 € | 600 € |
| - 2 imprimantes CANON Super G3 | 480 € | 160 € |
| - 1 imprimante HP Color Laserjet 2500 | 240 € | 80 € |
| - 1 imprimante HP Laserjet 2840 | | |
| * 1 imprimante HP Laserjet 4650 | | |
| * 1 imprimante HP Laserjet 1300 | | |
| * 1 imprimante HP Laserjet 1020 | 600 € | 200 € |
| - 1 fax CANON L 220 | | |
| * 1 photocopieur KONIKA MINOLTA sur stand | | |
| * 1 photocopieur CANON  IR 1600 | | |
| * 2 scaners à plat CANON | | |
| * 1 scaner HP (ancien modèle) | | |
| * 1 relieur IBICO 115 | | |
| * 1 destructeur de documents | 850 € | 300 € |
| - 1 chaine laser BANG & OLUFSEN | | |
| * 1 lampadaire halogène | | |
| * 1 lot d'encadrements et décorations | 600 € | 200 € |
| - 1 ensemble d'archives | mémoire | mémoire |
| **Salle de Conférence** | | |
| - 1 grande table ovale (wenge) | | |
| * 2 grands bureaux (wenge) | | |
| * 1 meuble de rangement à hauteur d'appui à 4 portes (wenge) | | |
| * 1 grande armoire à 4 portes (wenge) | | |
| * 2 casiers roulants | | |
| * 6 fauteuils traineau en cuir | | |
| * 2 fauteuils haut dossier en cuir sur roulettes | 1 500 € | 500 € |
| **Espace cuisine** | | |
| - 1 machine à café NESPRESSO | | |
| * 1 machine à café MAGIMIX | | |
| * 1 réfrigérateur table top, sans marque apparente | | |
| * 1 réfrigérateur table top LIEBHERR | | |
| * 1 micro ondes SHARP | 450 € | 150 € |
| **TOTAL DU MATERIEL DE BUREAU ET INFORMATIQUE** | **49 950 €** | **15 500 €** |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## MATERIEL D'EXPLOITATION

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **Hangar - CANNES LA BOCCA** | | |
| - 47 mètres de linéaire d'étagères métalliques (petit modèle) | 150 € | mémoire |
| - 13 mètres de linéaire de rack à 4 niveaux (petit modèle) (profonds) | 450 € | 150 € |
| - 8 X 2 mètres 70 de racks MECALUX à 2 niveaux | 1 200 € | 400 € |
| - 9 armoires de rangement métallique (ancien modèle) | 150 € | mémoire |
| **Atelier** | | |
| - 1 poste à souder SEBORA - soudure à l'arc | | |
| * 2 perceuses sur colonne (ancien modèle) | | |
| * 1 presse manuelle sur support (ancien modèle) | | |
| * 1 presse hydraulique OMCH 20T | | |
| * 1 scie circulaire sur établi (métallique) (ancien modèle) | | |
| * 1 chèvre d'atelier OMCH SL15 1500 kg | 1 080 € | 360 € |
| - 1 lot d'électroportatifs et disqueuses comprenant perceuses, ponceuses, perceuses sans fils | 450 € | 150 € |
| - 1 meuleuse double (ancien modèle) | | |
| * 5 chargeurs de batterie (ancien modèle) | | |
| * 1 meuleuse double sur portant (ancien modèle) | | |
| * 5 établis | | |
| * 1 rectifieur de soupape FORAX (très ancien modèle) | | |
| * 1 poste à souder oxy acétylène | | |
| * 1 ensemble d'outillage comprenant : | | |
| * 3 caisses à outils | | |
| * 2 boites à douilles | | |
| * 3 panneaux à clefs | | |
| * 1 établi de menuiserie | | |
| * 1 échaffaudage de peintre | | |
| * 3 halogènes d'atelier | | |
| * 2 aspirateurs (anciens modèles) | 1 150 € | 300 € |
| - 2 transpalettes | 300 € | 100 € |
| - 1 transpalette électrique avec son chargeur JUNGHENRICH EJC 12 | 2 400 € | 800 € |
| - 1 chariot élévateur CHART C500 - Y50 PD 2,5T Gazoil (ancien modèle) | 450 € | 150 € |
| - 1 chariot de manutention électrique avec son chargeur FENWICK WFT (petit modèle) | 450 € | 150 € |
| - 1 stock de bidons comprenant 1 bidon de savon, 1 bidon de nettoyage de cables, 1 bidon de liquide permanent, 1 bidon d'huile hydraulique | mémoire | mémoire |
| Un lot de formes, supports et plateaux comprenant | | |
| - 25 formes en V de transport et calage | | |
| * 4 supports en V travaux sous marine | | |
| * 5 plateaux à grandes roues et 4 à petites roues | | |
| * 74 tabourets | 3 000 € | 500 € |

François ISSALY
Julien PICHON
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## MATERIEL D'EXPLOITATION (suite)

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **Atelier - CANNES LA BOCCA (suite)** | | |
| - 1 cric d'atelier OMCH 15T | | |
| * 1 cric d'atelier 15T FOG | | |
| * 1 cric d'atelier 20T FOG | 600 € | 200 € |
| - 4 escabeaux en aluminium - 3 diables | 90 € | 30 € |
| - 1 palonnier GALLIA 5T | 150 € | mémoire |
| - 1 nettoyeur haute pression KARCHER HD 1094 (petit modèle) | 90 € | 30 € |
| - 1 compresseur à air ABAC 50HP2 (petit modèle) | | |
| - 1 aspirateur à eau | 150 € | 50 € |
| - 1 remorque MECANOREM TC 6060 (ancien modèle et | | |
| mauvais état) | 150 € | mémoire |
| - 1 remorque annexe MECANOREM (environ 2 ans) | 900 € | 300 € |
| | | |
| **Bureaux - CANNES LA BOCCA** | | |
| - 3 bureaux dont 1 avec retour en stratifié faux bois | | |
| * 12 sièges divers | | |
| * 2 caissons roulants | | |
| * 2 armoires en stratifié faux bois | | |
| * 1 armoire à volets coulissants | | |
| * 1 meuble bas | | |
| * 3 tables bureau (ancien modèle) | | |
| * 4 meubles métalliques bas à 2 portes coulissantes | | |
| * 1 armoire métallique | | |
| * 1 lot d'encadrements | | |
| * 1 réfrigérateur table top | | |
| * 1 machine à café | | |
| * 3 porte manteaux | | |
| * 4 lampes divers | 900 € | 300 € |
| | | |
| - 1 micro ordinateur IBM T60 avec écran DELL | | |
| * 2 micro ordinateurs DELL avec unité centrale, écran plat | | |
| * 1 micro ordinateur assemblage avec unité centrale, écran plat LG | 1 050 € | 350 € |
| | | |
| - 1 scaner HP 5590 | | |
| * 1 imprimante HP Color Laserjet 2600 | | |
| * 1 imprimante CANON PC 860 (ancien modèle) | | |
| * 1 scaner à plat AGFA | | |
| * 1 imprimante LEXMARK | | |
| * 1 imprimante XEROX (hors service) | | |
| * 1 télécopieur MINOLTA MF 1213 | 360 € | 120 € |

François ISSALY
Julien PICHON
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## MATERIEL D'EXPLOITATION (suite)

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| - 1 installation téléphonique SIEMENS comprenant :<br>* 6 postes fixes et 2 portatifs | 200 € | mémoire |
| - 1 serveur avec unité centrale | 200 € | mémoire |
| | mémoire | mémoire |
| **TOTAL MATERIEL D'EXPLOITATION** | **16 070 €** | **4 440 €** |

**N.B. : Il existe un bureau à Monaco dont le mobilier de bureau est entièrement amorti et ne présente pas de valeur marchande et dont les actifs mélangés à la Société CAMPER & NICHOLSON sont difficilement identifiables (selon les déclarations de M. Alexandre RODRIGUEZ et M. CHOKRON)**

## MATERIEL D'EXPLOITATION - BATEAUX

| | | Valeur Brute ou Rendement | Valeur Nette |
|---|---|---|---|
| **Bateaux étant utilisés dans le cadre du charter Immobilisés en 2008 et 2009** | | | |
| **Fiche N° 42**<br>VISUALISE<br>MANGUSTA 105 "SEA DIAMOND"<br>Réf. M105/16<br>Année : 2002<br>Localisation : France - Hyères | HT | 8 506 328 | 4 500 000 |
| **Fiche N° 43**<br>VISUALISE<br>MANGUSTA 105' TS "BAL HARBOUR"<br>Réf. M105/03<br>Année : 1997/2007<br>Localisation : France - Nice | HT | 6 743 659 | 2 500 000 |
| **Fiche N° 44**<br>VISUALISE<br>MANGUSTA 105' "COLUMBIA C"<br>Réf. M105/06<br>Année : 1998/2004<br>Localisation : Italie - Savona | TTC | 7 002 435 | 3 000 000 |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## MATERIEL D'EXPLOITATION - BATEAUX

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **DIVERS (utilisé dans le cadre de l'entreprise)** | | |
| - 1 NAVETTE SPECIAL CRAFT SC 1447<br>  Marque : MERCRUISER<br>  Mic 13672 - Année 2001<br>  Propulsion Mécanique<br>  (Acquisition en 2003 pour 140.000 €) | 100 000 € | 50 000 € |
| **TOTAL MATERIEL D'EXPLOITATION - BATEAUX (CHARTER) ET NAVETTE** | 22 352 422 € | 10 050 000 € |

François ISSALY
Julien PICHON
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## VEHICULES - MOTOS

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **SUZUKI 650 (sur désignation)**<br>Type : WVBU21<br>N°de série : JS1BU132100113957<br>MTT2 - ES - 7 CV<br>1ère mise en circulation : 17.05.2006<br>Immatriculation : **361 BOT 06**<br>Indication compteur : 3.220 km<br>**Très bon état général** | 3 000 € | 2 000 € |
| **GTS 125**<br>Type : LM25WIII12A3<br>N°de série : RFGLM12WY8S702524<br>MTL - ES - 1 CV<br>1ère mise en circulation : 20.05.2008<br>Immatriculation : **576 CBE 06**<br>Indication compteur : 39.474 km<br>**Bon état général** | 2 000 € | 1 200 € |
| **PIAGGIO 125**<br>Type :<br>N°de série :<br>MTL - ES - 2 CV<br>1ère mise en circulation : 04.05.2004<br>Immatriculation : **424 BFL 06**<br>Indication compteur : 10.478 km<br>**Quelques rayures** | 1 000 € | 600 € |
| **YAMAHA XMAX 125**<br>Type : SE32Ii<br>N°de série : VTLSE32000006501<br>MTL - ES - 1 CV<br>1ère mise en circulation : 07.06.2006<br>Immatriculation : **321 BOZ 06**<br>Indication compteur : 5.965 km<br>**Bon état général** | 1 500 € | 1 000 € |
| **YAMAHA MAJESTY 125 (sur désignation)**<br>Type : SE06IVii<br>N°de série : VTLSE068000004886<br>MTL - ES - 1 CV<br>1ère mise en circulation : 09.05.2007<br>Immatriculation : **207 BJY 83**<br>Indication compteur : 3.000 km<br>**Très bon état général** | 1 200 € | 800 € |

François ISSALY
Julien PICHON
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## VEHICULES - MOTOS (suite)

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **APRILIA ATLANTIC 125**<br>Immatriculation : **919 BLW 06**<br>Indication compteur : 20.781 km<br>**Copie carte grise illisible**<br>**Rayures et usures** | 800 € | 500 € |
| **MBK OVETTO 50**<br>**Compteur défaillant**<br>**Mauvais état général** | 300 € | 150 € |
| **VOLKSWAGEN CADDY SDI Logotisé**<br>Type : 9KVFAHB2<br>N°de série : WV1ZZZ9KZYR524049<br>CTTE - GO - 7 CV<br>1ère mise en circulation : 15.03.2000<br>Immatriculation ; **852 AHL 06**<br>Indication compteur : 100.056 km<br>**Chocs et usures**<br>**Etat général moyen** | 1 200 € | 800 € |
| **VOLKSWAGEN CADDY VAN TDI Logotisé**<br>Type : 2KNBJB2<br>N°de série : WV1ZZZ2KZ5X020378<br>CTTE - GO - 8 CV<br>1ère mise en circulation : 27.04.2005<br>Immatriculation : **86 BKX 06**<br>Indication compteur : 54.679 km<br>**Quelques chocs et griffes - Bon état général** | 4 500 € | 3 000 € |
| **CHRYSLER GRAND VOYAGER (sur désignation)**<br>Type : RGYB4503<br>N°de série : 1C8GYB4545Y532830<br>VP - GO - 10 CV<br>1ère mise en circulation : 21.07.2005.<br>Immatriculation : **712 BMA 06**<br>Indication compteur : 84.000 km<br>**Etat moyen** | 8 000 € | 6 000 € |

François ISSALY
Julien PICHON
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## VEHICULES - MOTOS (suite)

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **RENAULT ESPACE INITIALE**<br>Type : MRE5506HV862<br>N°de série : VF8JE0KOS26453990<br>VP - GO - 7 CV<br>1ère mise en circulation : 15.03.2002<br>Immatriculation : **384 AVC 06**<br>Indication compteur : 138.812 km<br>**Quelques chocs et rayures - Etat moyen** | 3 000 € | 2 000 € |
| **CITROEN C5 (sur désignation)**<br>Type : RDXFVJ<br>N°de série : VF7RDXFVJ54048875<br>VP - ES - 14 CV<br>1ère mise en circulation : 14.08.2008<br>Immatriculation : **975 CCK 06**<br>Indication compteur : 40.556 km<br>**Quelques chocs - Bon état général** | 16 000 € | 12 000 € |
| **RENAULT ESPACE 4 2,2 DCI INITIALE**<br>Type : MRE7616HN607<br>N°de série : VF1JKOHAB31281011<br>VP - GO - 7 CV<br>1ère mise en circulation : 21.04.2004<br>Immatriculation : **913 BFF 06**<br>Indication compteur : 116.262 km<br>**Quelques chocs et rayures - Bon état général** | 8 000 € | 5 000 € |
| **RENAULT ESPACE 4 2,2 DCI INITIALE**<br>Type : MRE7616HN607<br>N°de série : VF1JK0HAB31281045<br>VP - GO - 11 CV<br>1ère mise en circulation : 16.04.2004<br>Immatriculation : **265 BFE 06**<br>Indication compteur : 101.028 km<br>**Quelques chocs et rayures - Bon état général** | 8 000 € | 5 000 € |
| **MERCEDES BENZ E 320 CDI AVANT-GARDE**<br>Type : 211U026F0SBAAA500<br>N°de série : WDB2110261A785048<br>VP - GO - 12 CV<br>1ère mise en circulation : 20.04.2005.<br>Immatriculation : **160 BKV 06**<br>Indication compteur : 70.904 km | 18 000 € | 16 000 € |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

## VEHICULES - MOTOS (suite)

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **SMART (sur désignation)**<br>Type : MST1302A0110<br>N°de série : WME4540321B016642<br>VP - ES - 6 CV<br>1ère mise en circulation : 24.06.2004<br>Immatriculation : **465 BJL 06**<br>Indication compteur : 50.000 km<br>**(Accidentée)** | 1 500 € | 500 € |
| **SMART (sur désignation)**<br>Type : MST1302A0110<br>N°de série : WME4540321B009570<br>VP - ES - 6 CV<br>1ère mise en circulation : 17.06.2004<br>Immatriculation : **462 BJL 06**<br>Indication compteur : 66.000 km | 5 000 € | 3 000 € |
| **MERCEDES BENZ BREAK C220 CDI AVANT-GARDE**<br>Type : 203KR20CF0TEAAAA11<br>N°de série : WDB2032081F718864<br>VP - GO - 9 CV<br>1ère mise en circulation : 08.06.2005<br>Immatriculation : **277 BLK 06**<br>Indication compteur : 68.613 km<br>**Bon état général** | 13 000 € | 10 000 € |
| **MERCEDES BENZ BREAK C220 CDI AVANT-GARDE**<br>Type : 203KR20CF0TEAAAA11<br>N°de série : WDB2032081F719521<br>VP - GO - 9 CV<br>1ère mise en circulation : 08.06.2005<br>Immatriculation : **276 BLK 06**<br>Indication compteur : 62.401 km<br>**Bon état général** | 13 000 € | 10 000 € |
| **MERCEDES BENZ E 320 CDI AVANT-GARDE**<br>Type : 211U026F0SBAAA500<br>N°de série : WDB2110261A792476<br>VP - GO - 12 CV<br>1ère mise en circulation : 27.04.2005<br>Immatriculation : **818 BKW 06**<br>Indication compteur : 118.000 km<br>**Bon état général** | 18 000 € | 15 000 € |
| **TOTAL VEHICULES - MOTOS** | **127 000 €** | **94 550 €** |

François ISSALY
Julien PICHON
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## VEHICULES EN LOCATION OU CREDIT BAIL

| | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **En crédit bail auprès de COFICA BAIL contrat N°98073413135654 avec 48 échéances mensuelles, chacune d'un montant TTC de 609,04 € débutant le 05.11.2008. et se terminant le 05.11.2012.** | | |
| **CITROEN JUMPER BENNE Logotisé**<br>Type : YBBMDB/AX<br>N°de série : VF7YBBMDB11581099<br>CTTE - GO - 7 CV<br>1ère mise en circulation : 06.01.2009<br>Immatriculation : **570 CEC 06**<br>Indication compteur : 3.143 km<br>**Bon état général** | 22 000 € | 16 000 € |
| **En location auprès de la DIAC contrat N°3GH30809S avec 48 échéances mensuelles, chacune d'un montant HT de 317,66 € débutant le 08.08.2005 et se terminant le 08.07.2009.**<br><br>**N.B. : A la date de l'inventaire, la dernière échéance n'est pas encore réglée.** | | |
| **RENAULT TRAFIC DCI 100 Logotisé**<br>Type : FLACA6<br>N°de série : VF1FLACA65Y104254<br>CTTE - GO - 6 CV<br>1ère mise en circulation : 02.08.2005<br>Immatriculation : **77 BME 06**<br>Indication compteur : 78.370 km<br>**Quelques rayures - Bon état général** | 7 000 € | 5 000 € |
| **En crédit bail auprès de COFICA BAIL contrat N°98073413135653 avec 48 échéances mensuelles, chacune d'un montant TTC de 457,01 € débutant le 23.08.2007 et se terminant le 05.08.2011.** | | |
| **VOLKSWAGEN CADDY VAN TDI**<br>Type : 2KNBLS2<br>N°de série : WV1ZZZ2KZ7X111773<br>CTTE - GO - 8 CV<br>1ère mise en circulation : 10.08.2007<br>Immatriculation : **746 BXP 06**<br>Indication compteur : 20.061 km<br>**Bon état général** | 8 000 € | 6 000 € |

François ISSALY
Julien PICHON
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## VEHICULES EN LOCATION OU CREDIT BAIL (suite)

|  | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **En crédit bail auprès de MERCEDES BENZ FINANCEMENT** contrat N°838020 avec 48 échéances mensuelles, chacune d'un montant HT de 589,12 € débutant le 01.07.2006. et se terminant le 01.05.2010. | | |
| **MERCEDES BENZ C 220 CDI AVANT-GARDE** Type : 203R00CL0TDBBA500 N°de série : WDB2030081A877789 VP - GO - 9 CV 1ère mise en circulation : 14.06.2006 Immatriculation : **887 BRB 06** Indication compteur : 68.000 km **Quelques rayures - Bon état général** | 16 000 € | 12 000 € |
| **En crédit bail auprès de MERCEDES BENZ FINANCEMENT** contrat N°850429 avec 60 échéances mensuelles, chacune d'un montant HT de 1200,63 € débutant le 15.11.2006. et se terminant le 15.09.2011. | | |
| **MERCEDES BENZ ML BREAK** Type : 164B275K1N0AAA500 N° de série : WDC1641751A021687 VP - ES - 23 CV 1ère mise en circulation : 19.10.2005. Immatriculation : **196 BNC 06** Indication compteur : 58.181 km **Bon état général** | 18 000 € | 12 000 € |
| **En crédit bail auprès de MERCEDES BENZ FINANCEMENT** contrat N°859925 avec 48 échéances mensuelles, chacune d'un montant HT de 3.634,79 € débutant le 20.12.2006. et se terminant le 20.10.2010. | | |
| **MERCEDES BENZ S 65 V12 BI TURBO** Type : 221I17JK0SCBAB500 N°de série : WDD2211791A106197 VP - ES - 56 CV 1ère mise en circulation : 06.12.2006 Immatriculation : **953 BTG 06** Indication compteur : 47.018 km | 90 000 € | 45 000 € |

François ISSALY
Julien PICHON
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice<br>SAS SNP BOAT SERVICE 2009/070

## VEHICULES EN LOCATION OU CREDIT BAIL (suite)

|  | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **En crédit bail auprès de  MERCEDES BENZ FINANCEMENT contrat N°925565 avec 48 échéances mensuelles, chacune d'un montant HT de 975,83 € débutant le 05.06.2008. et se terminant le 05.05.2012.** |  |  |
| **MERCEDES BENZ E 320 TDI (sur désignation - A SAN REMO)**<br>Type : 211U020L0NZBBA511<br>N°de série : WDB2110221B329866<br>VP - GO - 14 CV<br>1ère mise en circulation : 23.05.2008.<br>Immatriculation : **390 CBF 06**<br>Indication compteur : 71.207 km<br>**Bon état général** | 35 000 € | 25 000 € |
| **En location longue durée auprès de  LEASE PLAN France contrat N°443374 avec 45 échéances mensuelles, chacune d'un montant TTC de 548,55 € débutant 07.2007 et se terminant 04.2011.** |  |  |
| **VOLKSWAGEN PASSAT 2.0 TDI 140 BREAK**<br>Type : 3CACBKPX0FM6FM62Q009ST0GGS<br>N° de série : WVWZZZ3CZ8E023141<br>VP - GO - 8 CV<br>1ère mise en circulation : 25.07.2007.<br>Immatriculation : **590 BXH 06**<br>Indication compteur : 61.155 km | 12 000 € | 9 000 € |
| **En location longue durée auprès de  LEASE PLAN France contrat N°423123 avec 48 échéances mensuelles, chacune d'un montant TTC de 684,23 € débutant 11.2006 et se terminant 10.2010.** |  |  |
| **MERCEDES BENZ C 220 CDI AVANT-GARDE**<br>Type : 203KR20CLOTDAAAA00<br>N°de série : WDB2032081F784714<br>VP - GO - 9 CV<br>1ère mise en circulation : 03.01.2007.<br>Immatriculation : **596 BTQ 06**<br>Indication compteur : 75.000 km<br>**Bon état général** | 19 000 € | 16 000 € |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## VEHICULES EN LOCATION OU CREDIT BAIL (suite)

|  | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **En location longue durée auprès de LEASE PLAN France contrat N°420358 avec 36 échéances mensuelles, chacune d'un montant TTC de 616,12 € débutant 01.2007. et se terminant 12.2009.**<br><br>**VOLKSWAGEN PASSAT 2.0 TDI 140 BREAK**<br>Type : 3C ACBKPX0<br>N°de série : WVWZZZ3CZ7E132440<br>VP - GO - 8 CV<br>1ère mise en circulation : 27.12.2006.<br>Immatriculation : **883 BTN 06**<br>Indication compteur : 142.711 km<br>**Bon état général** | 10 000 € | 7 000 € |
| **TOTAL VEHICULES EN LOCATION OU CREDIT BAIL** | **237 000 €** | **153 000 €** |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## MATERIEL EN DEPOT - EN LOCATION OU APPARTENANT DES TIERS

|  | Valeur d'exploitation TTC | Valeur de réalisation TTC |
|---|---|---|
| **Faisant l'objet d'une location longue durée auprès de la Société LOCAM SAS 29, rue Léon Blum 42048 SAINT ETIENNE.** contrat N°546592 avec 21 échéances trimestrielles d'un montant chacune HT de 1.417,50 € débutant le 20.01.2007. et se terminant le 30.09.2011. <br> - 1 système d'installation de détection incendie | mémoire | mémoire |
| **Faisant l'objet d'une location longue durée auprès de la Société LOCAM SAS 29, rue Léon Blum 42048 SAINT ETIENNE.** contrat N°0358133 avec 4 échéances trimestrielles d'un montant chacune HT de 346,01 € débutant le 30.04.2009. et se terminant le 30.01.2010. <br> - 1 copieur numérique KONICA série 20726974 KONICA <br> **(Localisation : ST TROPEZ)** | mémoire | mémoire |
| **Faisant l'objet d'une location longue durée auprès de la Société LOCAM SAS 29, rue Léon Blum 42048 SAINT ETIENNE.** avec 63 échéances mensuelles d'un montant chacune HT de 47,00 € <br> - 1 système de secours de ligne | mémoire | mémoire |
| **Appartenant à la Société CHÂTEAU D'EAU** <br> - 2 fontaines à eau |  |  |
| **Appartenant à la Société HERMES** <br> - 1 meuble de présentation logotisé avec vaisselle, verrerie et couverts | mémoire | mémoire |
| **Appartenant à la Société VEOLIA** (récupération de déchets) <br> - 1 panier <br> - 1 caisse d'huile usagées <br> - 1 fût de filtre à huile <br> - 1 fût aérosol | mémoire | mémoire |
| **A France TELECOM** <br> - 1 live box | mémoire | mémoire |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SA SNP BOAT SERVICE 2009/070

## STOCKS BATEAUX FINIS ET RECUS AU 07/04/2009

|  | Valeur Brute | Provision 30/09/2008 Pour dépréciation | Travaux en Cours 30/09/2008 | Valeur Nette |
|---|---|---|---|---|
| **STOCK BATEAUX OCCASION** |  |  |  |  |
| **Fiche N° 1**                       **HT** NON VISUALISE MANGUSTA 72' "MATCHINHO" Réf. M72/23 Année : 2004 Localisation : Espagne - Ibiza | 2 900 000 | -1 324 312 | 4 312 | 1 580 000 |
| **Fiche N° 2**                       **TTC** NON VISUALISE LEOPARD 23m "BROADWAY" Réf. L23/03 Année : 1996 Localisation : Espagne - Palma | 1 200 000 | -613 946 | 133 946 | 720 000 |
| **Fiche N° 3**                       **TTC** VISUALISE LEOPARD 24m "TRIPLE FUN" Réf. 24/03 Année : 2001 Localisation : France - Cogolin | 3 100 000 | -1 497 651 | 157 651 | 1 760 000 |
| **Fiche N° 4**                       **HT** VISUALISE MANGUSTA 72' "CLAUDIA S" Réf. M72/25 Année : 2004 Localisation : France - Golfe Juan | 2 000 000 |  |  | 2 000 000 |
| **Fiche N° 5**                       **TTC** VISUALISE SARNICO MAXIM 55' "DADDY COOL" Réf. Année : 1995 Localisation : France - Golfe Juan | 650 000 | -309 275 | 29 275 | 370 000 |
| **Fiche N° 6**                       **TTC** VISUALISE LEOPARD 23m "CLAN V" Réf. L23/32 Année : 2004 Localisation : France - Golfe Juan | 2 100 000 | -763 961 | 63 961 | 1 400 000 |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SA SNP BOAT SERVICE 2009/070

## STOCKS BATEAUX FINIS ET RECUS AU 07/04/2009

|  | Valeur Brute | Provision 30/09/2008 Pour dépréciation | Travaux en Cours 30/09/2008 | Valeur Nette |
|---|---|---|---|---|
| **STOCK BATEAUX OCCASION** | | | | |
| **Fiche N° 7**　　　　HT<br>VISUALISE<br>MANGUSTA 80' "CARINA"<br>Réf. M80/08<br>Année : 1995<br>Localisation : France - Golfe Juan | 2 050 000 | -820 540 | 270 540 | 1 500 000 |
| **Fiche N° 8**　　　　HT<br>VISUALISE<br>MANGUSTA 80' "KOLAHA TOO"<br>Réf. M80/53<br>Année : 2004<br>Localisation : France - Golfe Juan | 3 800 000 | -1 085 276 | 65 276 | 2 780 000 |
| **Fiche N° 9**　　　　HT<br>VISUALISE<br>MANGUSTA 80' "UMBERTO V"<br>Réf. M80/54<br>Année : 2004<br>Localisation : France - Golfe Juan | 3 000 000 | -1 058 417 | 58 417 | 2 000 000 |
| **Fiche N° 10**　　　HT<br>VISUALISE<br>MANGUSTA 105' "Z" Hard top<br>Réf. M105/23<br>Année : 2005<br>Localisation : France - Golfe Juan | 8 500 000 | -2 030 499 | 30 499 | 6 500 000 |
| **Fiche N° 11**　　　HT<br>NON VISUALISE<br>LEOPARD 24m "RG 512 IV"<br>Réf. 24/15<br>Année : 2004<br>Localisation : Grèce - Piraeus | 3 400 000 | -1 301 523 | 191 523 | 2 290 000 |
| **Fiche N° 12**　　　TTC<br>NON VISUALISE<br>CORSARO 60 "SUN"<br>Réf.<br>Année :<br>Localisation : Italie - Carrara<br>(fiche non communiquée) | 600 000 | -150 000 |  | 450 000 |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SA SNP BOAT SERVICE 2009/070

## STOCKS BATEAUX FINIS ET RECUS AU 07/04/2009

| | Valeur Brute | Provision 30/09/2008 Pour dépréciation | Travaux en Cours 30/09/2008 | Valeur Nette |
|---|---|---|---|---|
| **STOCK BATEAUX OCCASION** | | | | |
| **Fiche N° 13** HT<br>NON VISUALISE<br>MANGUSTA 80' "TEMPTATION"<br>Réf. M80/24<br>Année : 1998<br>Localisation : Italie - La Spezia | 2 000 000 | -530 365 | 260 365 | 1 730 000 |
| **Fiche N° 14** HT<br>NON VISUALISE<br>PRIMATIST G50 "SKULL"<br>Réf. Open<br>Année : 2004<br>Localisation : Italie - La Spezia | 450 000 | -153 805 | 3 805 | 300 000 |
| **Fiche N° 15** TTC<br>NON VISUALISE<br>LEOPARD 23m "CARIOKA" Hard top<br>Réf. L23/02<br>Année : 1996<br>Localisation : Italie - Rome | 1 478 755 | -1 026 988 | 248 233 | 700 000 |
| **Fiche N° 16** HT<br>VISUALISE<br>LEOPARD 24m "HORACE"<br>Réf. 24/06<br>Année : 2002<br>Localisation : Italie - San Remo | 3 100 000 | -1 248 258 | 28 258 | 1 880 000 |
| **Fiche N° 17** TTC<br>VISUALISE<br>MANGUSTA 80' "MIKE S"<br>Réf. M80/14<br>Année : 1996<br>Localisation : Italie - Savona | 3 000 000 | -1 312 452 | 42 452 | 1 730 000 |
| **Fiche N° 18** HT<br>VISUALISE<br>MANGUSTA 80' "HARD WORK"<br>Réf. M80/19<br>Année : 1997/2004<br>Localisation : Italie - Savona | 2 400 000 | -773 782 | 23 782 | 1 650 000 |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SA SNP BOAT SERVICE 2009/070

## STOCKS BATEAUX FINIS ET RECUS AU 07/04/2009

|  | Valeur Brute | Provision 30/09/2008 Pour dépréciation | Travaux en Cours 30/09/2008 | Valeur Nette |
|---|---|---|---|---|
| **STOCK BATEAUX OCCASION** |  |  |  |  |
| **Fiche N° 19**      **TTC** <br> VISUALISE <br> MANGUSTA 80' "PAPILLON" <br> Réf. M80/21 <br> Année : 1998 <br> Localisation : Italie - San Remo | 2 500 000 | -884 272 | 284 272 | 1 900 000 |
| **Fiche N° 20**      **TTC** <br> VISUALISE <br> MANGUSTA 80' "B WATERS" <br> Réf. M80/34 <br> Année : 2000 <br> Localisation : Italie - San Remo | 3 800 000 | -2 081 639 | 381 639 | 2 100 000 |
| **Fiche N° 21**      **TTC** <br> VISUALISE <br> HUDSON 61' "KRILL IV" <br> Réf. <br> Année : 2004 <br> Localisation : Italie - San Remo | 900 000 | -316 119 | 6 119 | 590 000 |
| **Fiche N° 22**      **TTC** <br> VISUALISE <br> ITALCRAFT "SUAVESITA" <br> Réf. <br> Année : <br> Localisation : Italie - San Remo | 50 000 |  |  | 50 000 |
| **Fiche N° 23**      **TTC** <br> VISUALISE <br> RIVA FURAMA 58 "AGAPI" <br> Réf. <br> Année : 1989 <br> Localisation : Italie - San Remo | 1 250 000 | -394 124 | 64 124 | 920 000 |
| **Fiche N° 24**      **HT** <br> VISUALISE <br> SUNSEEKER CAMARGUE 55 "MAJTLU" <br> Réf. <br> Année : 1996 <br> Localisation : Italie - San Remo | 440 000 | -104 840 | 4 840 | 340 000 |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SA SNP BOAT SERVICE 2009/070

## STOCKS BATEAUX FINIS ET REÇUS AU 07/04/2009

| | Valeur Brute | Provision 30/09/2008 Pour dépréciation | Travaux en Cours 30/09/2008 | Valeur Nette |
|---|---|---|---|---|
| **STOCK BATEAUX OCCASION** | | | | |
| **Fiche N° 25**               **HT** VISUALISE SARNICO MAXIM 58 "VAGABOND" Réf. Année : 2003 Localisation : Italie - San Remo | 800 000 | -193 401 | 3 401 | 610 000 |
| **Fiche N° 26**               **TTC** VISUALISE LEOPARD 27m "MARIGANE" Réf. L27/02 Année : 1995 Localisation : Italie - Savona | 3 000 000 | -2 225 061 | 325 061 | 1 100 000 |
| **Fiche N° 27**               **TTC** VISUALISE LEOPARD 27m "SEVEN TATOO" Réf. 27/16 Année : 2001 Localisation : Italie - Savona | 3 000 000 | -1 052 572 | 42 572 | 1 990 000 |
| **Fiche N° 28**               **TTC** VISUALISE MANGUSTA 80' "TIZIANA" Réf. M80/01 Année : 1992/2004 Localisation : Italie - Savona | 1 864 185 | -757 228 | 113 043 | 1 220 000 |
| **Fiche N° 29**               **HT** VISUALISE MANGUSTA 80' "CELESTINE" Réf. M80/31 Année : 2000 Localisation : Italie - Savona | 3 580 000 | -1 759 016 | 89 016 | 1 910 000 |
| **Fiche N° 30**               **HT** VISUALISE MANGUSTA 105 SPORT "FIROUZEH" Réf. M105/04 Année : 1997 Localisation : Italie - Savona | 4 000 000 | -1 595 171 | 95 171 | 2 500 000 |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SA SNP BOAT SERVICE 2009/070

## STOCKS BATEAUX FINIS ET REÇUS AU 07/04/2009

| | Valeur Brute | Provision 30/09/2008 Pour dépréciation | Travaux en Cours 30/09/2008 | Valeur Nette |
|---|---|---|---|---|
| **STOCK BATEAUX OCCASION** | | | | |
| **Fiche N° 31**               **HT**<br>VISUALISE<br>MANGUSTA 108' TS "CELCASCOR"<br>Réf. 108/04<br>Année : 2001<br>Localisation : Italie - Savona | 9 200 000 | -3 851 825 | 251 825 | 5 600 000 |
| **Fiche N° 32**               **HT**<br>VISUALISE<br>CERRI 52' "TOP FEET"<br>Réf. Open<br>Année : 2004<br>Localisation : Italie - Savona | 600 000 | -171 396 | 11 396 | 440 000 |
| **Fiche N° 33**               **HT**<br>VISUALISE<br>TECNOMAR MADRAS "LITTLE SKY"<br>Réf. Open<br>Année : 2000<br>Localisation : Italie - Savona | 600 000 | -72 350 | 12 350 | 540 000 |
| **Fiche N° 34**               **TTC**<br>VISUALISE<br>TECNOMAR MADRAS 63LADY CAROLA<br>Réf. Open<br>Année : 1998<br>Localisation : Italie - Savona | 700 000 | -158 467 | 48 467 | 590 000 |
| **Fiche N° 35**               **HT**<br>NON VISUALISE<br>MANGUSTA 105/10 "ARES"<br>Réf. M105/10<br>Année : 2000<br>Localisation : Italie - Viareggio | 5 850 000 | -2 530 000 | | 3 320 000 |

Page 28

François ISSALY
Julien PICHON
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SA SNP BOAT SERVICE 2009/070

## STOCKS BATEAUX FINIS ET REÇUS AU 07/04/2009

| STOCK BATEAUX OCCASION | Valeur Brute | Provision 30/09/2008 Pour dépréciation | Travaux en Cours 30/09/2008 | Valeur Nette |
|---|---|---|---|---|
| | | | | |
| **Fiche N° 36**　　　　**HT** <br> NON VISUALISE <br> MANGUSTA 80' "DIAMOND A" <br> Réf. M80/07 <br> Année : 1994 <br> Localisation : USA - Miami | 1 003 629 | | | 1 003 629 |
| **Fiche N° 37**　　　　**HT** <br> NON VISUALISE <br> MANGUSTA 108' "FOURSOME" <br> Réf. 108/14 <br> Année : 2004 <br> Localisation : USA - Miami | 9 000 000 | -2 132 439 | 152 439 | 7 020 000 |
| **TOTAL STOCK BATEAUX OCCASION** | 97 866 569 | -2 132 439 | 3 498 030 | 65 083 629 |

**N.B. : Les sommes (colonne 2) libellées en rouge constituent des provisions correspondant aux pertes envisagées (décotes) en raison de l'éffondrement du marché du bateau d'occasion.**

**Les valeurs ci-dessus portées dans l'inventaire nous ont été communiquées par M. Alexandre RODRIGUEZ et M. CHOKRON.**

ISSALY
PICHON
...aires-Priseurs Judiciaires

Sauvegarde de Justice
SA SNP BOAT SERVICE 2009/070

## STOCKS BATEAUX FINIS ET RECUS AU 07/04/2009

|  | Valeur Brute | Valeur Nette |
|---|---|---|
| **STOCK BATEAUX NEUFS** | | |
| **Fiche N° 45** VISUALISE LEOPARD 31m SPORT "LEOPARD 31m" Réf. 31/05 Année : 2007 Localisation : Dubaï Faisant l'objet d'une procédure de saisie conservatoire. | 5 984 002 | 5 984 002 |
| **Fiche N° 46** VISUALISE MANGUSTA 80' "NEW BOAT" Réf. M80/72 Année : 2008 Localisation : France - Golfe Juan | 3 467 914 | 3 467 914 |
| **Fiche N° 47** VISUALISE LEOPARD 32m "CONCEPT LEOPARD" Réf. 32/06 Année : 2007 Localisation : France - Hyères | 6 244 027 | 6 244 027 |
| **Fiche N° 48** VISUALISE MANGUSTA 92' "NEW BOAT" Réf. M92/24 Année : 2008 Localisation : Italie - San Remo **Faisant l'objet d'une procédure de saisie conservatoire.** | 5 139 486 | 5 139 486 |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SA SNP BOAT SERVICE 2009/070

## STOCKS BATEAUX FINIS ET RECUS AU 07/04/2009

|  | Valeur Brute | Valeur Nette |
|---|---|---|
| **STOCK BATEAUX NEUFS** | | |
| **Fiche N° 49**<br>VISUALISE<br>LEOPARD 32m "LEOPARD 32m"<br>Réf. 32/07<br>Année : 2008<br>Localisation : Italie - San Remo | 6 226 199 | 6 226 199 |
| **Fiche N° 50**<br>NON VISUALISE<br>NEW LEOPARD 24m "LEOPARD 24m"<br>Réf. 24/30<br>Année : 2007<br>Localisation : Turquie - Istanbul | 3 106 120 | 3 106 120 |
| **Fiche N° 51**<br>NON VISUALISE<br>MANGUSTA 80' Hard top"MANGUSTA"<br>Réf. M80/65<br>Année : 2007<br>Localisation : USA - Miami | 3 327 786 | 3 327 786 |
| **N.B. : Ces valeurs correspondent au prix de revient des bateaux.** | | |
| **Bateaux en cours de construction**<br>(Chantiers ARNO et OVERMARINE)<br><br>**N.B. : Les bateaux étant en cours de construction n'ont pas été comptabilisés et facturés.** | mémoire | mémoire |
| **TOTAL STOCK BATEAUX NEUFS** | **33 495 534** | **33 495 534** |

**Note générale sur le stock de bateaux et charters**
**Il est précisé que les bateaux visualisés par nos soins,**
**soit 34 bateaux, sont en parfait état d'entretien et de conservation.**

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SAS SNP BOAT SERVICE 2009/070

## STOCK MATERIEL

| | Valeur d'achat HT |
|---|---|
| **Cannes la Bocca – Hangar** | |
| Un stock de pièces détachées, pointé en date du 03/06/2009, pour un montant total HT de : **(cf. liste précise et détaillée en annexe)** | 88 247 € |
| **N.B. : Figure dans le stock un ancien stock totalement amorti de pièces pour équipement bateaux RIVA, il s'agit d'un stock peu utilisé et dormant. D'autre part, figure dans le stock un bateau (annexe) d'année 2002 dont il faut prévoir une décote Enfin, des hélices commandées mais difficiles à revendre.** | |
| Un stock de Kamewa (pièces de moteurs), pointé en date du 3 juin 2009, pour un montant total HT de : **(cf. liste précise et détaillée en annexe)** | 154 446 € |
| Un stock de décoration, pointé en date du 29 mai 2009, pour un montant total HT de : **(cf. liste précise et détaillée en annexe)** | 90 610 € |
| **N.B. : Figure dans le stock quelques pièces qui sont des retours clients, difficiles à revendre :** | |
| Dont un stock de robinetterie, pointé en date du 3 juin 2009, pour un montant total HT de : 44.655 € **N.B. : Il s'agit d'un stock neuf de retour clients.** | |
| Un stock de consommables, pour un montant total HT de : **(selon les déclarations de M. RATTO)** | 2 000 € |
| **TOTAL STOCK** | **335 303** |

**François ISSALY**
**Julien PICHON**
Commissaires-Priseurs Judiciaires

Sauvegarde de Justice
SA SNP BOAT SERVICE 2009/070

## RECAPITULATIF GENERAL

| | Valeur d'exploitation | Valeur de réalisation |
|---|---|---|
| MATERIEL DE BUREAU ET INFORMATIQUE | 49 950 | 15 500 |
| MATERIEL D'EXPLOITATION | 16 070 | 4 440 |
| VEHICULES | 127 000 | 94 550 |
| VEHICULES EN LOCATION OU CREDIT BAIL | 237 000 | 153 000 |
| MATERIEL EN DEPOT EN LOCATION OU APPARTENANT A DES TIERS | mémoire | mémoire |
| **TOTAL GENERAL** | **430 020** | **267 490** |

| | Valeur Brute ou Rendement HT ou TTC | Valeur Nette HT ou TTC |
|---|---|---|
| BATEAUX (CHARTER) ET NAVETTE (immobilisations) | 22 352 422 | 10 050 000 |
| **TOTAL GENERAL** | **22 352 422** | **10 050 000** |

| | Valeur Brute HT ou TTC | Valeur Nette HT ou TTC |
|---|---|---|
| STOCK BATEAUX NEUFS ET OCCASIONS | 131 362 103 | 98 579 163 |
| **TOTAL GENERAL** | **131 362 103** | **98 579 163** |

| | Valeur d'achat HT |
|---|---|
| STOCK MATERIEL | 335 303 |
| **TOTAL GENERAL** | **335 303** |